

IN THE DISTRICT COURT OF
Payne County, Oklahoma
FILED

JUL 10 2014

By: LISA S. LAMBERT, Court Clerk
_____ Deputy

IN THE DISTRICT COURT IN AND FOR PAYNE COUNTY
STATE OF OKLAHOMA

| | |
|---|---|
| JOHN THOMAS TALLEY, an individual | Case No.: CJ-2014-285 |
| Plaintiff, | |
| v. | Judge: Kistler |
| 1. TIME INC., d/b/a SPORTS ILLUSTRATED MAGAZINE, a Foreign–For–Profit–Corporation, | **Attorney Lien Claimed**<br>**Jury Trial Demanded** |
| 2. GEORGE DOHRMANN, an individual, | |
| 3. THAYER EVANS, an individual, | |
| Defendants. | |

## PETITION

**COMES NOW**, Plaintiff John Talley, by and through his attorneys of record, and hereby submits his Petition with claims against Defendants Time Inc., d/b/a Sports Illustrated Magazine, a foreign for-profit-business corporation, and individuals George Dohrmann, and Thayer Evans. Pursuant thereto, Plaintiff informs the Court as follows:

### JURISDICTION, PARTIES & VENUE

1. Plaintiff is and has been at all times relevant to this action a citizen of the State of Oklahoma, and all times relevant to the claims alleged herein was a resident of Payne County, Oklahoma.

2. Based on information and belief, Defendant Time Inc., Sports Group, d/b/a Sports Illustrated Magazine (hereinafter "Sports Illustrated Magazine") is a foreign–for-profit magazine publishing corporation organized under the laws of the State of Delaware with its principle place of business in the State of New York.

1

Exhibit 1

3.  Based on information and belief, Defendant George Dohrmann is a resident of San Francisco, California and at all times relevant to this action, was an agent /employee of Sports Illustrated Magazine engaged to write and publish stories on its behalf.

4.  Based on information and belief, Defendant Thayer Evans is a resident of Texas, and at all times relevant to this action, was an agent / employee of Sports Illustrated Magazine engaged to write and publish stories on its behalf.

5.  Based on information and belief, Defendants Dohrmann and Evans were acting within the scope and course of their employment / agency relationship and with Defendant Sports Illustrated Magazines' acquiescence when they published the articles complained of herein. Hereinafter, Defendants Dohrmann and Evans shall be referred collectively as Sports Illustrated's agents.

6  Subject matter jurisdiction is proper in the district courts of the State of Oklahoma pursuant to Okla. Const. art. 7, §7 (granting district courts of this state unlimited general jurisdiction over all matters sounding either in law or equity) and Okla. Stat. tit. 12, §2004(F) (authorizing courts of this state to exercise jurisdiction on any basis consistent with the Constitutions of the United States and Oklahoma). The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00).

7.  Personal jurisdiction over the out of state Defendants is proper pursuant to the State of Oklahoma's long arm statute - Okla. Stat. tit. 12, §2004(F) - authorizing courts of this state to exercise jurisdiction on any basis consistent with the Constitutions of the United States and Oklahoma. Defendant Sports Illustrated by itself and /or through its agents systematically distribute and sell their Sports Illustrated Magazine in the State of Oklahoma, as well as maintain a website fully accessible in this state as a further medium to distribute

and promote their publications. In addition, Defendant Sports Illustrated by itself and /or through its agents was physically present in this state in furtherance of its alleged investigatory activities that led to the writing, generation, and publication of the article (s) subject of this lawsuit.

8. Venue is proper in Payne County pursuant to Okla. Stat. tit. 12, §187 as that provision provides that in cases where all of the defendants, like here, are non- residents of the State of Oklahoma, then the county in which the plaintiff resides – here Payne County – is where the action properly lies.

### STATEMENT OF THE FACTS

9. Plaintiff incorporates paragraphs 1 through 9, *supra*, as though stated *verbatim* below.

10. Since August of 1993, Plaintiff has worked as an Area Representative for the North Central Oklahoma area for the Oklahoma Fellowship of Christian Athletes ("OFCA"), a domestic not-for-profit organization organized under the laws of the State of Oklahoma.

11. The OFCA is affiliated with the national arm of the Fellowship of Christian Athletes ("FCA"), a non-profit-organization whose mission is to reach out and minister to coaches and athletes ("professionals, college, high school, junior high and youth levels") the Christian values of Jesus Christ in order for them to "receiv[e] Jesus Christ as Savior and Lord, serv[e] Him in their relationships and in the fellowship of the church."

12. The FCA and consequently, the OFCA, carry out their missions through the advent of prayer and Bible related programs, community outreaches, camping activities and school campus efforts aimed specifically at coaches and athletes.

13. Plaintiff, as the Area Representative for the OFCA in North Central Oklahoma, covers Stillwater, Oklahoma, the Oklahoma State University ("OSU") campus and the surrounding areas in furthering his employer's mission (*supra* ¶11). As a necessary consequence of his employment activities, Plaintiff has had extensive interaction with OSU students, including athletes (among them participants of the OSU football program). Plaintiff would engage OSU students (including athletes and some participants of the OSU football program) in team building exercises and community work efforts for minimal compensation, all aimed at teaching viable and desirable social skills such as team work, communication, trust, good work ethic, while also providing the students who chose to participate a small source of earned income.

14. Based on information and belief, Defendant Sports Illustrated Magazine publishes its namesake sports magazine - Sports Illustrated – to over 3 million subscribers and it is distributed and read all over the United States by approximately 23 million adults each week, including approximately 18 million men. Defendant Sports Illustrated Magazine also maintains a website on the world-wide-web as a further medium to support its Sports Illustrated publications.

15. On or about September 10, 2013, through September 16, 2013, Defendant Sports Illustrated by itself and /or through its agents published a five (5) series story in Sports Illustrated Magazine relating to the OSU football program, and in the course of doing so, made particular, specific, and malicious allegations against Plaintiff. The series were conveniently titled: "The Money" (First Article); "The Academics" (Second Article); "The Drugs" (Third Article); "The Sex" (Fourth Article); The "Fall Out" (Fifth Article).

16.     Defendant Sports Illustrated, aided by the other listed Defendants, published a five (5) series story which alleged grave improprieties in the management and administration of the OSU football program and certain individuals affiliated with the players in differing capacities. Chief among those allegations, and the subject of this lawsuit, was that Plaintiff "grossly overpaid ... [OSU football players] for jobs they did or compensated them [OSU football players] for jobs they didn't do."

17.     Through the course of the articles, Defendants painted Plaintiff as an overzealous "booster" who made systematic improper financial contributions to OSU's football players. In addition, for example:

> [a.] Defendant Sports Illustrated by itself and /or through its agents knowingly and intentionally published false claims by former OSU football player - Brad Girtman - that Plaintiff paid him "$1,500 to $2,000 every two weeks during one summer to work on his [Plaintiff's] ranch, far more than the job was worth."
>
> [b.] If Defendants have accurately reported what they say Seymore Shaw told them that Plaintiff "set up speaking gigs for players, paying $100 for a 15-20-minute talk" and that an athlete "might get more depending on who . . . they were," those allegations were completely false.
>
> [c.] Defendant Sports Illustrated by itself and /or through its agents knowingly and intentionally published false claims by Fath' Carter that Plaintiff paid him money to "help shoe

horses," allegedly in furtherance of Plaintiff's alleged illegal booster activities.

[d.] Defendant Sports Illustrated by itself and /or through its agents knowingly and intentionally published false claims that Aso Pogo – one of the former OSU football players in the articles – had told them that he had knowledge of serious ethical violations by Plaintiff in the form of alleged illegal payments to OSU players – specifically himself - in regards his temporary summer living arrangements.

[e.] Defendant Sports Illustrated by itself and /or through its agents falsely published knowingly and intentionally that Aso Pogo had told them that when he was the starting quarterback for the OSU football team, a local overzealous booster – Plaintiff - allowed him to live at his ranch rent free during one summer.

[f.] Defendant Sports Illustrated by itself and /or through its agents knowingly, intentionally, and falsely published that "[Plaintiff] Talley says that he sometimes paid players a fee for speaking arrangements . . . ."

[g.] Defendant Sports Illustrated by itself and /or through its agents also knowingly and intentionally published in a misleading and out of context manner that Plaintiff told them

6

that "he cleared the speaking fees with . . . the university's compliance office."

18. Since Defendants published their series of five (5) articles on the OSU football program and Plaintiff's alleged wrongdoing in the course of performing his duties, OSU suspended Plaintiff's outreach activities in relation to OSU's student athletes.

### First Cause of Action
### False Light - Invasion of Privacy
### (Against Sports Illustrated And Its Agents)

19. Plaintiff adopts and re-alleges each and every allegation set forth above as though fully set forth below.

20. On or about September 10, 2013, through September 16, 2013, Defendants by themselves and /or through their agents published a series of five (5) articles in Sports Illustrated magazine and on the world wide web relating to the Oklahoma State University ("OSU") football program, in the course of doing so, making particular, specific, and serious unfounded allegations against Plaintiff (herewith incorporating *verbatim* allegations in ¶17[a-g], *supra*).

21. Based on information and belief, Defendants' allegations (herewith incorporating *verbatim* allegations in ¶17 [a-g], *supra*) published in their articles concerning Plaintiff were distributed and likely read by Sports Illustrated Magazines' 3 million subscribers all over the United States, by approximately 23 million adults each week, and an estimated 18 million men, while the articles were in circulation.

22. Defendants' allegations (herewith incorporating *verbatim* allegations in ¶17 [a-g], *supra*) were false, lacked factual basis, and were printed and published with actual malice. As a result of the falsity in the allegations against Plaintiff, the general public in

Stillwater, Oklahoma, the rest of the State of Oklahoma where the OSU football team has significant following and across the United States, was made to see Plaintiff in a false light – as an overzealous "booster" and not a legitimate Christian college athlete outreach leader committed to reaching and ministering to coaches and athletes the Christian values of Jesus Christ in order for them to "receiv[e] Jesus Christ as Savior and Lord, serv[e] Him in their relationships and in the fellowship of the church."

23. Furthermore, as a result of Defendants' articles, the public was made to see Plaintiff in a false light - as a dishonest man - in that he was systematically engaged in improperly giving OSU football players illegal and unwarranted money. Also, as a consequence, given the moral platform of integrity and excellence on which Plaintiff stands in his outreach activities for the OFCA, Defendants' false, juxtaposed, and malicious allegations made him look like a hypocrite to the public.

24. Given the gravity of Defendants' false, defamatory and malicious allegations of dishonesty and illegality against Plaintiff and the resultant serious damage to his credibility and standing, any reasonable person would have found Defendants' allegations highly offensive.

### ACTUAL MALICE
### (In Regards To Sports Illustrated And Its Agents)

25. Defendants knowingly and purposefully published falsely that Aso Pogo – one of the former OSU players in the articles – had told them that he had personal knowledge of serious ethical violations by Plaintiff in the form of alleged illegal payments to some OSU football players – specifically himself in relation to his temporary summer living arrangements. Defendants published this intentionally, knowingly and fully aware that Aso Pogo had not made any such malicious and offensive statements or remarks about Plaintiff.

26. Furthermore, Defendants knowingly misrepresented Plaintiff's temporary work and stay arrangement with Aso Pogo – wherein he was allowed to stay with Plaintiff's family at no monetary cost in exchange for Aso's work efforts around the farm – apparently as part of creating an illusion of a rent free scheme provided to OSU's athletes in furtherance of Plaintiff's alleged illegal booster activities. Yet at the time of Aso Pogo's interview, he expressly told Defendants that although he did not pay Plaintiff any money to stay with Plaintiff's family, he was required to perform work in exchange for the cost of his stay. Defendants knowingly, purposefully, and intentionally chose to falsify his statements by omitting material facts about the true, and proper nature of Aso Pogo's temporary living arrangements with Plaintiff's family knowing and fully appreciating that in doing so, the general public would perceive Plaintiff as a cheat, an overzealous booster and a fraud, not as an authentic Christian youth outreach leader.

27. Defendants also purposefully and knowingly misrepresented in their articles that Plaintiff is an overzealous "booster" for the OSU football team. Defendants knew from their alleged ten months of investigating that Plaintiff works full-time as a Christian college athlete outreach leader committed to reaching and ministering the gospel of Jesus Christ to athletes and coaches as well as the community as a whole to which he has devoted his life. Furthermore, even with the benefit of ten months of investigating, Defendants published their articles with malicious accusations against Plaintiff with full knowledge that it was highly improbable that he was an overzealous booster given the fact that Plaintiff is a fully devoted full-time employee for a non-profit organization and family man with a modest income who lives on a small farm, not a ranch as prominently stated in Defendant's articles. Even on his best day, Plaintiff could not possibly have paid the

exorbitant sums of money published to as many of the athletes as were alleged, for as long as was claimed.

28. During the single five (5)-minute meeting between Plaintiff and Defendants in Stillwater, Oklahoma, Plaintiff Talley informed them that the allegations against him were absolutely false and that Defendants should re-check their facts and particularly their sources before going to press. In fact, right before the articles were set for publication, Defendants failed to show up to a scheduled meeting between the parties to discuss the allegations in the articles. Half an hour before the scheduled meeting Defendants cancelled, without offering any plausible explanation. Even though Defendants did not make a meaningful effort to interview Plaintiff to get his side of the story, Plaintiff did manage, albeit briefly, to warn Defendants that allegations against him were absolutely untrue and that Defendants should check the records at the OSU compliance office and to speak to other independent sources before proceeding to publish the false allegations against him. Defendants purposefully and deliberately chose to ignore Plaintiff's notice of the highly probable falsity of the allegations against him.

29. Defendants knowingly and intentionally printed and published falsely that in their interview with Plaintiff, he told them that he paid players for speaking arrangements, knowing very well that in the brief encounter between the two parties, Plaintiff never made any such statement. The most that Plaintiff managed to say to Defendants was that the allegations against him were absolutely false and that Defendants needed to re-check their factual sources.

30. Defendants published their malicious allegations against Plaintiff with reckless disregard for the truth of their publications. Defendants were confronted with

obvious reasons to doubt the veracity and accuracy of the reports of one of their key informants – Seymour Shaw – but completely ignored them and still went ahead and published. Shaw was convicted in 2006 in Oklahoma of larceny and a felony of burglary. If indeed Shaw told Defendants what they claim, that Plaintiff "set up speaking gigs for players, paying $100 for a 15-20-minute talk" and that an athlete "might get more depending on who . . . they were," the totality of the circumstances considering Shaw's criminal convictions for crimes of dishonesty, combined with Plaintiff Talley's notice to Defendants that the allegations against him were absolutely false, Defendants published their allegations against Plaintiff with a high degree of awareness of probable falsity, and in doing so, they acted with actual malice, i.e., with a reckless disregard for the truth of their publications.

31. Because Defendants harbored a high degree of awareness of the probable falsity of their allegations, they made a deliberate effort to avoid the truth in failing to avail themselves of freely accessible records in possession of OSU's compliance department and Plaintiff, which if consulted, would have confirmed the falsity of their sources' claims. The gist of Defendants' allegations against Plaintiff were accurately and properly documented in accessible public records at OSU in its compliance department. Contrary to Defendants' unfounded allegations that Plaintiff paid Brad Girtman "$1,500 to $2,000 every two weeks during one summer," records at OSU clearly show that Plaintiff has never paid any student more than $600 for any work done in any summer or three-month period. Plaintiff has always filed his pay records and details of his activities with OSU athletes with the OSU compliance department. These records are available. Defendants have never charged that the records at the compliance office are unreliable, nor did their "investigative" efforts ever furnish any plausible proof that such was ever the case. Defendants simply, purposefully, and

deliberately chose to ignore the truth by not availing themselves of the available public records, especially after being put on notice of the highly probable falsity of their sources' allegations. Had Defendants chosen to avail themselves of these records, they would have plainly seen that all the work done on Plaintiff's property was paid at no more than the standard $12/per hour and that no student ever made more than $600 for any work done in any summer or three-month period.

33. Furthermore, the public records at the OSU compliance department would have easily shown that OSU athletes were never paid for speaking arrangements, but were reimbursed reasonable food and gas expenses. The need to verify with the records was imperative considering that Defendants had notice of the highly probable falsity of their sources' allegations.

33. For instance, Fath' Carter – one of the sources in the article – his credibility was in serious question throughout the articles. Fath' Carter, for example, claimed in Defendants' series of articles that in 2004 he had classes with a famous former OSU football player, Tatum Bell, and that the two of them improperly received grades that they did not deserve. Yet, in fact, Tatum Bell in 2004 was no longer an enrolled student at OSU; he had withdrawn from OSU to prepare for the NFL draft. Furthermore, Fath' Carter in the course of Defendants' series of articles claimed that he graduated with an education degree from OSU when in fact, accessible records at the university registrar's office show that he never graduated.

34. In addition, another key source in the articles, former OSU football player Artrell Woods, his credibility was patently stained with bias. Woods injured his back in 2007 while a member of OSU's football program. Woods still experiences problems with his back

and feels to this very day that OSU should pay him money for his injuries and that he was not treated "right." All this bespeaks of a person with a more than plausible reason for being biased against any and all affiliated with the OSU football program. Defendants knew and had all this information, but they chose to ignore it.

35. Even with their sources' credibility patently deficient, Defendants purposefully and deliberately chose to ignore the truth by not availing themselves of the plethora of available public records at OSU's compliance department and by not verifying with Plaintiff's own personal records to check against the serious allegations they were making against him, especially after being put on notice of the highly probable falsity of their allegations.

36. If not independently, then by the aggregate of the falsity of Defendants' claims and their willful inaction as outlined above, it can reasonably be inferred that Defendants' decision – not to assess the veracity of their sources' claims against freely accessible public records in the wake of notice of highly probable falsity – was a product of a deliberate decision by Defendants not to acquire knowledge of facts that would have confirmed the falsity of their sources' claims.

### EXEMPLARY AND PUNITIVE DAMAGES
(Against All Defendants)

37. The acts and omissions by Defendants as set forth in the preceding paragraphs in this Petition demonstrate that Defendants were engaged in conduct and/or practices evincing malice and/or reckless indifference to Plaintiff's rights.

38. As a direct result of Defendants' malice and/or reckless disregard for Plaintiff's rights, Plaintiff is entitled to exemplary and punitive damages in an amount to be

determined at trial commensurate with the financial resources available to Defendants and sufficient to deter others similarly situated from like behavior.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Talley prays this Court to grant him relief in the form of monetary damages in excess of the amount required for diversity jurisdiction pursuant to 28 U.S.C. §1332 of the United States Code, punitive and exemplary damages, pre-judgment and post judgment interest and as well as any and all further relief this Court deems appropriate.

Respectfully submitted,

*[signature]*

Gary L. Richardson, OBA No. 7547
Charles L. Richardson, OBA No. 13388
Jason C. Messenger, OBA No. 19887
Mbilike Mwafulirwa, OBA No. 31164
Richardson Richardson Boudreaux PLLC
7447 S. Lewis Ave.
Tulsa, Oklahoma 74136
(918) 492-7674 (Telephone);(918) 493-1925 (Facsimile)
***Attorneys for Plaintiff: John Talley***