## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **John Thomas Talley,**<br><br>        **Plaintiff,**<br><br>    v.<br><br>**Time, Inc., d/b/a Sports Illustrated Magazine,** *et al.*,<br><br>        **Defendants.** | **Case No. CIV- 14 - 853 - D**<br><br>**Jury Trial Demanded**<br><br>**Attorney Lien Claimed** |

### PLAINTIFF'S AMENDED COMPLAINT

Plaintiff, John T. Talley, by his undersigned counsel, hereby submits his Amended Complaint in accordance with this Court's Order of February 11, 2015 [Doc. 15]. For his Amended Complaint, Plaintiff states and alleges as follows:

1.      John Talley brings this civil action predicated on Oklahoma law against Time, Inc., d/b/a Sports Illustrated Magazine ("Sports Illustrated") and reporters George Dohrmann and Thayer Evans (collectively "Defendants"). Plaintiff has advanced a false light theory of recovery. This action stems from Defendants' five series publication entitled "The Dirty Game." In that 5-part publication — specifically part one (1) entitled "The Money" — Defendants made certain false statements specifically against John Talley that portrayed him in a false light. The allegations against Mr. Talley were deliberately false and, in other respects, published with reckless disregard for truth. As a result of Defendants' wrongful conduct, Plaintiff alleges he has suffered injury and damages.

## I. JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. §1332 because of complete diversity between the parties. Plaintiff John Talley is a citizen of Oklahoma, while Defendant Time, Inc., is organized under the laws of the State of Delaware, with the State of New York as its principle place of business. Defendant George Dohrmann is a citizen of the State of Oregon and, based on information and belief, resides in Ashland, Oregon. Finally, Defendant Thayer Evans is a resident of Galveston, Texas. The amount in controversy exceeds $75,000.00. As such, diversity jurisdiction is proper.

3.      Personal jurisdiction over the out of state Defendants is proper pursuant to the State of Oklahoma's long arm statute — Okla. Stat. tit. 12, §2004(F) — authorizing exercise of personal jurisdiction on any basis consistent with the Constitutions of the United States and Oklahoma. In that regard, Defendant Time, Inc., by itself and /or through its agents, systematically distributes and sells its Sports Illustrated Magazine in the State of Oklahoma, as well as maintains a website fully accessible in Oklahoma as a further medium to distribute and promote its publications. In addition, Defendant Sports Illustrated, by itself and /or through its agents, was physically present in the State of Oklahoma in furtherance of its alleged investigatory activities that led to the writing, generation, and publication of the article(s) that are the subject of this lawsuit.

4.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b) in that a substantial part of the events and/or omissions giving rise to the claim occurred in the Western District of Oklahoma.

## II. PARTIES

### A.      Plaintiff John T. Talley

5.      John Thomas Talley is the Plaintiff in this action. He is an Oklahoma family man and resident of Payne County, Oklahoma. Mr. Talley lives on a small 5-acre farm.

6.       Since August of 1993, Mr. Talley has served as a youth pastor and also as an Area Representative for the North Central Oklahoma area for the Oklahoma Fellowship of Christian Athletes ("OFCA"), a domestic not-for-profit organization organized under the laws of the State of Oklahoma. The OFCA is affiliated with the national arm of the Fellowship of Christian Athletes ("FCA"), a non-profit-organization whose mission is to reach out and minister to coaches and athletes ("professionals, college, high school, junior high and youth levels"), the Christian values of Jesus Christ in order for them to "receiv[e] Jesus Christ as Savior and Lord, serv[e] Him in their relationships and in the fellowship of the church."

7.      In his capacity as the Area Representative for the OFCA in North Central Oklahoma, Mr. Talley visits the Oklahoma State University ("OSU") campus and the surrounding areas to further his employer's mission. As a necessary consequence of his employment activities, Plaintiff has had extensive interaction with Oklahoma State University ("OSU") students, including athletes (among them participants of the OSU football program). Plaintiff would engage OSU students (including athletes and some participants of the OSU football program) in team building exercises and community work efforts, all aimed at teaching them viable and desirable social skills such as team

work, communication, trust, good work ethic, while also providing the students who chose to participate a small source of earned income.

8.      Throughout his team building exercises with the OSU students, Mr. Talley always required that the students give some consideration for any benefit extended to them. For instance, if a student received a monetary benefit, they received no more than $12 per hour for work done. If other non-monetary benefits were extended, Mr. Talley required the student to give consideration of equal or proportionate value in exchange for that benefit. For instance, if a student was extended free-room and board, he/she had to give consideration of equal or proportionate value in the form of work around the farm.

**B.      Defendants Time, Inc., George Dohrmann, & Thayer Evans**

9.      Defendant Time, Inc., publishes a nationally circulated sports magazine, Sports Illustrated ("S.I."). Based on information and belief, S.I. has over 3 million subscribers and it is distributed and read all over the United States by approximately 23 million people each week. Defendant Time, Inc., also maintains a website on the world-wide-web as a further medium to support its Sports Illustrated publications.

10.     Defendant George Dohrmann is a senior writer and/or reporter for Sports Illustrated. He was, in whole and/or in part, responsible for investigating, writing, editing and publishing the falsehoods at issue on behalf of S.I. In doing so, Defendant Dohrmann was acting within the course and scope of his agency and/or employment with Time, Inc., and/or S.I. Magazine.

11.     In similar fashion, Defendant Thayer Evans is a writer and/or reporter for Sports Illustrated. He was, in whole and/or in part, responsible for investigating, writing,

editing and publishing the falsehoods at issue on behalf of S.I. In doing so, Defendant Evans was acting within the course and scope of his agency and/or employment with Time, Inc., and/or S.I. Magazine.

## III. BACKGROUND

### A. Sports Illustrated Magazine's Five Part Publication: The Dirty Game; Part I -- The Money

12.     S.I. announced to the world that for a period of ten (10) months, its writers, George Dohrmann and Thayer Evans, were assigned to perform a detailed factual investigation of the OSU football program.

13.     While allegedly investigating the OSU football program, S.I. charged its two principal fact finders the task of writing about how a football program goes from "Very Bad to Very Good Very Fast."

14.     To carry out their assignment, S.I. and its reporters claimed that they left no stone unturned. Allegedly, 64 former players and staffers were interviewed, and S.I. presented to the world that the results were damning.

15.     So true and incriminating were the results of its serious investigatory findings, S.I. claimed that it was necessary to publish five (5) separate articles — conveniently titled: "The Money" (First Article); "The Academics" (Second Article); "The Drugs" (Third Article); "The Sex" (Fourth Article); The "Fall Out" (Fifth Article) — to tell the world how the OSU football program went from "Very Bad to Very Good Very Fast." The entire series was published on or about September 10, 2013 through September 16, 2013.

16.     According to S.I., the OSU football program was a fraud. S.I. reported that OSU used sex to recruit players, overlooked drug use, had lax drug and academic enforcement policies, and neglected its players after they were injured and/or deemed no longer useful to serve the program's needs. In the article entitled "The Money," S.I. went so far as to claim that OSU had a systematic scheme of illegal boosting activities to propel its on pitch successes.

17.     In that same article, Defendants took particular and specific liberties in their depiction of Mr. Talley's activities with OSU student athletes.

18.     According to S.I.'s accounts, Mr. Talley was not just a youth pastor, but was really a financial booster whose generosity far exceeded that of OSU football fans and was improper.

19.     More specifically, S.I. published that:

> According to multiple players, though, the generosity of Norris, who died of lung cancer in 2006, was exceeded by that of other Cowboys supporters. John Talley, an area director of the Fellowship of Christian Athletes, had been close to the football program since at least 2002, when his son, Saul, was a walk-on long snapper. "John Talley was the hot name around campus," Johnson says. "If you needed a job, call John Talley."
>
> Carter, Girtman, Johnson and Thomas Wright each say that Talley either grossly overpaid them for jobs they did or compensated them for jobs they didn't do. They allege that numerous other players benefited from Talley's generosity too. Girtman says Talley paid him $1,500 to $2,000 every two weeks during one summer to work on his horse ranch, far more than the job was worth. Talley could also be counted on to set up speaking gigs for players, paying $100 for a 15- to 20-minute talk. "You might get more depending on who you were," says Shaw. Carter says he and a few other players were once paid by Talley to help shoe horses.

Asked if the players did the work, Carter says, "Are you kidding? Most of us hadn't even seen a horse before."

Quarterback Aso Pogi (1999 to 2002) says he and another player lived at Talley's ranch one summer rent-free. In retrospect Pogi says, "It's a big deal. I was the starting quarterback." (Talley says that Pogi lived at his ranch and had to work to cover his rent; Pogi denies that he did any work.)

Talley says that he sometimes paid players a fee for speaking engagements and that they frequently did work on his ranch, noting he always paid an hourly wage. He also says he cleared the speaking fees and the hourly employment through the university's compliance office. "I have paid lots of players to work on my ranch," Talley says. "But I would never pay someone not to work."

OSU compliance director Kevin Fite says of the speaking engagements arranged by Talley, "They were not cleared through our office as paid speaking engagements. In fact, two of my staff members indicated to me that they had had conversations with John and told him you cannot pay for speaking engagements. If you want to employ our student-athletes for other things, that's fine, but you cannot pay them for speaking engagements."

While Fite says the school cleared Talley to employ athletes on his ranch, he acknowledges that Talley's paying in cash "is not something I am comfortable with. I think that's a concern. I would prefer to see it done a different way."

*See* Thayer Evans, *Special Report on Oklahoma State Football: Part 1 – The Money*, SPORTS ILLUSTRATED, Sept. 16, 2013.

### B.    False Light - Tort In Oklahoma

20.    Mr. Talley has asserted a false light claim. In false light claims, "actual truth of statements is not necessarily an issue, a false impression relayed to the public, is." *McCormack v. Okla. Pub. Co.*, 613 P.2d 737, 741 (Okla. 1980).

C.      **The Actual Malice Requirement — A Federal Constitutional Rule**

21.     Oklahoma adopted the *New York Times v. Sullivan*, 376 U.S. 252 (1964), actual malice standard for false light against media defendants. *Colbert v. World Pub. Co.*, 747 P.2d 286, 290 (Okla. 1987).

22.     Thus far, the actual malice standard "cannot be fully encompassed in one infallible definition." *St. Amant v. Thompson*, 390 U.S. 727, 730 (1968). But at its core and most direct, it captures deliberate falsehoods. *See Time, Inc. v. Hill*, 385 U.S. 374, 389-390 (1967) ("calculated falsehood[s] enjoy no immunity" and neither does a "lie, knowingly and deliberately published") (citations omitted).

23.     Considering that beyond direct falsehoods, actual malice also encompasses a defendant's "subjective awareness of probable falsity," *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 335 (1974), "proof may take the form of circumstantial evidence." *St. Amant*, 390 U.S. at 732.

## IV.  FACTUAL ALLEGATIONS

24.     Mr. Talley has for approximately (20) years been a youth pastor in the Northeastern Oklahoma area. His passions in life are his relationship with the Lord, his family and working with young people teaching and helping them develop character. Mr. Talley has consistently committed his efforts and energy to these three passions and has been known as such by his family, friends, and community.

25.      Before September of 2013, Mr. Talley was a simple man, with an equally fitting personal reputation and platform. He was not, for example, a widely known man in

the United States, and most certainly, not to sports reporters, passionate football fans, investigative journalists and/or the National Collegiate Athletic Association ("NCAA").

26.    Neither was he affiliated or known to partake in or do any financial boosting activities. In reality, through out the years, Mr. Talley had cultivated and stood on a platform of integrity and excellence in his outreach activities for the OFCA, while working with students and young people.

27.    But that all dramatically changed in September of 2013 when Defendants decided that they wanted to run a blockbuster "investigatory" story on the OSU Cowboys football program. S.I. engaged Defendants George Dohrmann and Thayer Evans for that assignment.

28.    Defendant George Dohrmann, among other things, was a veteran sports writer, while Evans had lived and attended school in Oklahoma. The goal of the alleged investigation was to explore in full the dynamics involved in making a mediocre football program become great in a short time.

29.    The focal point of the purported investigation was former players and staffers, and the editorial team centered the investigation on this direction. Based on information and belief, S.I. felt that OSU's program was dirty; they just needed someone and/or some people to bolster up that belief. Based on information and belief, the editorial team believed that in order to discover the less glorified things about something, such as a football program, it is best to look in less glorified places and at its less glorified participants.

30.     Plaintiff alleges a choice was made by S.I.'s writing and editorial teams. This story was going to be featured in predominant sporting circles and was going to be a story worth talking about. The plot was centered on a glorified university football program and the subjects included money, sex, drugs, academic misconduct, and of course, like all good dramas, the indispensable ingredient of any tragedy: the victims of the fall out.

31.     The "investigating" began sometime in late 2012. With the two reporters, Dohrmann and Evans, leading the efforts, S.I. ploughed through their various subjects for well over ten (10) months, and in the process, S.I. learned the ins-and-outs of the program. It was after all, a serious investigatory effort on S.I.'s part, as Defendants have repeatedly said.

32.     S.I. was determined to find dirt, and in doing so, it left no stone unturned. In fact, S.I. personally chose the people (former players and staffers) it wanted to feature.

33.     According to Defendants, they researched and thoroughly checked everything to create their five (5) part series – this was a "thorough" investigation. They knew everything there was to know.

34.     S.I. tracked its sources down. In the process of doing so, the editorial team researched the profiles and backgrounds of former players and staffers, in order to find them. S.I. did in fact find the sources' addresses and personal identifying information. And in many instances, after the sources were thoroughly researched, then either Dohrmann and/or Thayer personally interviewed them. So by the time these sources were being interviewed, S.I. was aware of a substantial amount of personal information on

each of the sources. As part and parcel of that thorough knowledge, S.I. was well aware, for instance, that their sources had reported false information and/or had suspect veracity. Through the course of the investigation, S.I. also became aware that many of the players had been kicked off the team for misconduct of some kind. For this lot, the bias was patently obvious. And some, even when S.I. took down their historical accounts and recorded them, and poured over those testimonies, based on information and belief, it sounded to them too good to be true. On the same token, given all that S.I. knew about most of these sources and their well-documented propensity to falsify — from its 10-months of thorough investigating and background checking — Plaintiff alleges that S.I. harbored serious doubts about the truthfulness of the allegations being passed on to them.

35.     For example, Fath' Carter, an OSU football alum and a key source in "The Money" article, told Dohrmann and Thayer that in 2004, he had classes with a famous former OSU football player, Tatum Bell. According to Carter, he and Bell improperly received grades that they did not deserve. Upon information and belief, however, since everything had been thoroughly checked out, including their sources, Dohrmann, Evans and the editorial team had serious doubts about this and his other claims. Given their extensive knowledge and coverage of college football and the NFL, they knew that Tatum Bell was no longer an enrolled student at OSU in 2004 because he had withdrawn from OSU to prepare for the NFL draft.

36.     The doubts about the truthfulness of Fath' Carter's claims were further amplified by their 10-month investigation of all things OSU football. Fath' Carter claimed to them that he graduated with an education degree from OSU. Given that

Dohrmann and Thayer had thoroughly checked everything as they said they had, they upon information and belief, discovered evidence that strongly suggested that Carter never graduated. In fact, to them, and everyone else, Fath' Cater was nothing more than a former player with an axe to grind. Despite all these doubts lingering in their minds about his veracity and about the truth behind his claims, Carter's historical account was gobbled up and selected for publication without a second thought. After all, the goal was to have a blockbuster story of a dirty program.

37.    The same was true with Dohrmann and Thayer's decision to interview Seymore Shaw. When S.I. had selected to interview Shaw, it had undertaken extensive efforts, as with other sources, to track him down. Plaintiff alleges that by the time S.I. and its reporters had purportedly interviewed Shaw, they were well aware of his criminal history, such as counts for larceny and felony burglary. As such, based on information and belief, S.I. had reason to question what he was saying to them. On the same token and in addition to knowing Shaw's multiple criminal past, Dohrmann, Evans and the editorial team must have seriously doubted whether the reported historical account was in fact true.

38.    Dohrmann, Evans and the editorial team spoke to one former player and staffer after another, and in total, interviewed approximately sixty-four (64) sources. Those sources all had something in common; they were all former participants of the OSU football program.

39.     Of those sources, S.I. made sure to speak in detail with the former players. S.I. questioned them on their focus subjects: money, sex, drugs and academic misconduct.

40.     S.I. was told of a youth pastor, John Talley. He was said to spend a lot of time around the OSU campus, with students (athletes and non-athletes alike). He was a local Stillwater resident who lived on a small farm not too far away from the school. He indeed paid students, but only after they performed some very physically demanding work. His rule was simple: No work, no pay. In fact, the pay formula was simple: no more than $12 per hour for work done. Insofar as compensating OSU students in non-monetary ways, Mr. Talley required the students to give consideration of equal or proportionate value in exchange. For instance, if a student was provided room and board for the summer, he/she had to give consideration of equal or proportionate value in the form of work around the farm, in exchange.

41.     Upon information and belief, this is what the players told S.I. Girtman did not actually say he was paid between $1,500 and $2,000 to work for Mr. Talley at any given time.  Neither did Thomas Wright nor Johnson. They each spoke of being paid the going hourly rate.

42.     S.I. turned its attention to Aso Pogi, a former OSU quarterback. Defendants asked him about his relationship with Mr. Talley. He informed them that he knew Talley and he had actually stayed at his house one summer. Since he did not pay money for the room, Mr. Talley required him to give consideration of equal or proportionate value in exchange — in the form of physically demanding work around the farm. In fact, Pogi felt

it was some of the most physically demanding work he had ever done. This is what S.I. was told.

43.     At some point during these "investigations," S.I. talked to Shaw about Mr. Talley's arranging of speaking engagements. Mr. Talley periodically arranged speaking engagements for OSU student athletes to speak to high school students and other young people. For the time the OSU students invested in speaking, Mr. Talley *reimbursed* the participating athletes for their food and gas expenses, and a receipt was required. No one was *paid* as stated by S.I., in the articles. Shaw correctly stated that neither he, or anyone he knew, ever got paid by Mr. Talley. Mr. Talley documented his reimbursements to the students, and these records were on file with the OSU compliance department.

44.     In order to fit these findings with the theme of the story it was publishing, based on information and belief, S.I. decided that both the players' accounts and the Plaintiff himself, John Talley, would have to be recast in an entirely different light than they truly were. After all, the goal was to have a blockbuster story of a dirty program.

45.     Instead of a committed family man, youth pastor, and a person who, for nearly twenty years had cultivated and stood on a platform of integrity and excellence in his outreach activities for the OFCA, S.I. recast him as one of the leading financial boosters of the OSU football program.

46.     Never mind that everything Mr. Talley gave to OSU students was based on a simple *something for something* arrangement (*i.e.*, money and/or accommodation in

exchange for proportionate work actually done), S.I. recast him as someone who gave

*something for nothing* to the athletes in clear violation of the NCAA rules.[1]

47.    In order to bolster the overall theme of its story, S.I. recast Mr. Talley's

*reimbursements* of food and gas to participating athletes as *actual payments* of $100 or

more for 15-20 minute talks, when in fact that was never the case at all.

48.    But that was not the end of it. S.I. went further, still. Instead of the

presenting the truth on how Mr. Talley compensated OSU students for their job

assignments; that they were paid at no more than $12 per hour of work done; and that

insofar as non-monetary benefits were ever extended to any OSU student, Mr. Talley

required the beneficiary to give consideration of equal or proportionate value in exchange

— this was completely recast. S.I. chose to recast these facts instead into in a different

light to make it appear that the athletes were actually paid between $1,500 and $2,000

working for Mr. Talley, and that some of the students were paid for not doing any work.

---

[1] The NCAA Bylaws in Art. 15.2.7 (b) (2012-13 version) provide: "The student-athlete is compensated *only* for work *actually performed*" (Emphasis added). Also, see NCAA Bylaw Art. 15.2.7 (c), which provides: "The student-athlete is compensated at *a rate commensurate* with the *going rate in that locality for similar services*."(Emphasis added). Similarly, NCAA Bylaw Art. 16.11.1.1 generally prohibits exclusive gifts or services to student athletes unless they are also generally available to other students. *See also* NCAA Bylaw Art. 16.11.2 (same). *available at* https://www.ncaapublications.com/p-4284-2012-2013-ncaa-division-i-manual-available-for-order-now-for-delivery-after-aug-1.aspx  (last accessed March 3, 2015).

Squarely, Defendants' allegations that Mr. Talley either grossly overpaid players or paid them for work not done, or paid them $100 or more speaking arrangements, or even the exclusive live-in arrangements are all illegal and prohibited pursuant to NCAA rules. *Supra*. A program that acts contrary to these rules is a fraud.

49.     In fact, Aso Pogi's remarks were deliberately falsified. Pogi made it clear to S.I. during his interviews that he had to give value and/or consideration in exchange for his living space with Mr. Talley and his family on their farm. More specifically, Pogi informed S.I. that, in exchange for that living space, he worked hard performing manual labor. Yet, S.I. recast his statements and instead reported that he lived with the Talley's for free, in furtherance of Mr. Talley's boosting activities. Put differently, S.I. had, with clear purpose and desire, conflated the difference between an innocent and proper *something for something* arrangement (*i.e.*, proportionate money and/or accommodation in exchange for community work actually done), with a *something for nothing* arrangement that fit the description of prohibited boosting activities under the NCAA rules.

50.     Defendants' false allegations regarding Mr. Talley's arrangements with the OSU students, as identified *above*, were published in the S.I. magazine and on their website www.si.com. These allegations were distributed and read by S.I. Magazines' 3 million subscribers all over the United States and online by approximately 23 million adults each week.

51.     As expected, Defendants' statements, as alleged herein, drew and captivated the attention of the national sports community, the citizens of the State of Oklahoma, the communities surrounding OSU and the NCAA.

52.     Given the severity of Defendants' false and malicious statements, any reasonable person in Mr. Talley's shoes would have found these allegations very

offensive, as he in fact did. For Mr. Talley, this was particularly true as his image, reputation, mental tranquility and well-being were severely distressed and injured.

53.     The NCAA began a series of investigations on OSU and Mr. Talley, and he was the subject of multiple detailed interrogations in connection with his community outreach activities altogether.

54.     As a result of the fall out from the resulting scandal, OSU suspended John Talley's outreach activities in relation to its student athletes, altogether.

55.     Defendants' allegations caused Mr. Talley to suffer severe emotional distress and damage. As soon as the allegations became public, Mr. Talley was absolutely "sick to his stomach", he became depressed, and for days on, he lost his joyfulness. Mr. Talley spent many days and moments crying and feeling so depressed and helpless for being made a victim of a brutal and ruthless attack on his image, reputation, moral standing and character. Many a times he had to resort to calling his friends and spending time with them to help him cry less.

56.     But as S.I.'s claims began to take root in the community and spread nationally, the mental anguish and distress started to break Mr. Talley. He started having sleep problems, twisting and turning at night, and he was unable to sleep from the pain. He sought medical attention, and his doctors prescribed him sleeping pills to assist him with getting sleep. As if that was not enough, to further assist him to cope with his mental distress and anguish, he was referred for professional counseling and psych treatment. He was robbed of his peace and tranquility.

57.     Mr. Talley's family also faced the same unwarranted pressures and distresses. His family life was greatly affected because the pressure of this entire ordeal putting a strain on his marriage, as he was not available and present as he ought to have wanted.

58.     From the forgoing allegations, and pursuant to the terms of Oklahoma law, Plaintiff, John Talley, hereby asserts his cause of action seeking relief below.

## V. CAUSE OF ACTION
## False Light - Invasion of Privacy
## (Against All Defendants)

59.     Plaintiff re-alleges and incorporates by reference the allegations contained in all the preceding paragraphs as though stated herein *verbatim*.

60.     On or about September 10, 2013, through September 16, 2013, Defendants, by themselves and /or through their agents, published a series of five (5) articles in Sports Illustrated magazine and on the World Wide Web relating to the OSU football program, and in the course of doing so, made particular, specific, serious and deliberate false allegations against Plaintiff.

61.     Defendants' allegations were false, lacked a factual foundation, and were printed and published with actual malice. As a result of the falsity in the allegations against Plaintiff, the general public in Stillwater, the State of Oklahoma and everywhere across the United States, viewed Plaintiff in a false light, and as a dishonest man, in that he was systematically engaged in improperly giving OSU football players illegal and unwarranted money. Also, as a consequence, given the moral platform of integrity and excellence on which Plaintiff stands in performing his outreach activities for the OFCA,

Defendants' false, juxtaposed, and malicious allegations made him look like a hypocrite to the public.

62.     Given the severity of Defendants' false, defamatory and malicious allegations, any reasonable person in Mr. Talley's shoes would have found these allegations very offensive, as he in fact did. For Mr. Talley, this was particularly true as his image, reputation, mental tranquility and wellbeing were severely distressed and injured.

63.     As a  direct and proximate result of Defendants' conduct, Plaintiff has suffered severe emotional damage and injury to his image, character and/or standing, for which he seeks compensation as outlined in the entirety of this instrument.

## VI. EXEMPLARY AND PUNITIVE DAMAGES
### (Against All Defendants)

64.     Plaintiff re-alleges and incorporates by reference the allegations contained in all the preceding paragraphs as though stated herein *verbatim*.

65.     The acts and omissions by Defendants as set forth in the preceding paragraphs in this Complaint demonstrate that Defendants were engaged in conduct and/or practices evincing malice and/or reckless indifference to Plaintiff's rights.

66.     As a direct result of Defendants' malice and/or reckless disregard for Plaintiff's rights, Plaintiff is entitled to exemplary and punitive damages in an amount to be determined at trial commensurate with the financial resources available to Defendants and sufficient to deter others similarly situated from like behavior.

## VII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully prays that the Court grant judgment in his favor against Defendants for the cause(s) of action alleged herein in an amount in excess of $75,000, exemplary and punitive damages, attorney's fees, costs, pre-and-post judgment interest, and for such further relief as the Court deems just and proper

Respectfully submitted,

**RICHARDSON RICHARDSON BOUDREAUX**

/s/ GARY  L. RICHARDSON
Gary L. Richardson, OBA No. 5747
Charles L. Richardson, OBA No. 13388
Jason C. Messenger, OBA No. 19887
Melissa A. East, OBA No. 21695
Mbilike Mwafulirwa, OBA No. 31164
Richardson Richardson Boudreaux
7447 S. Lewis Ave.
Tulsa, Oklahoma 74136
(918) 492-7674 (Telephone)
(918) 493-1925 (Facsimile)
***Attorneys for Plaintiff***