IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JOHN THOMAS TALLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | Case No. CIV-14-853-D |
| | ) | |
| TIME, INC., d/b/a Sports Illustrated Magazine, *et al.*, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

# **O R D E R**

Before the Court is Defendants' Motion for Summary Judgment [Doc. No. 60], filed pursuant to Fed. R. Civ. P. 56. Plaintiff has filed a response [Doc. No. 71] and, with permission, a supplemental brief [Doc. No. 107]. Defendants have filed a reply [Doc. No. 78] and a supplemental brief [Doc. No. 110]. Thus, the Motion is ripe for decision.

In this diversity case, Plaintiff John Thomas Talley claims that Defendants Time, Inc. d/b/a Sports Illustrated Magazine ("Sports Illustrated" or "SI") and its employees or agents, Defendants George Dohrmann and Thayer Evans, published a magazine article that invaded Plaintiff's privacy by publicly placing him in a false light. Plaintiff is proceeding under the Amended Complaint [Doc. No. 16], filed after the Court's initial Rule 12(b)(6) ruling [Doc. No. 15]. Following the completion of discovery, Defendants assert that they are entitled to summary judgment because Plaintiff cannot establish the essential elements of his tort claim under Oklahoma law.[1]

---

[1] The parties agree that Plaintiff's action is governed by Oklahoma substantive law.

Defendants contend the undisputed facts show: 1) the statements about Plaintiff in the article were not substantially and materially false but, instead, were true; 2) the statements were not highly offensive to a reasonable person; and 3) the statements were not published with "actual malice" as defined by Oklahoma law. Specifically, regarding the last element, Defendants argue that Plaintiff cannot show they knew of or recklessly disregarded "'the falsity of the publicized matter and the false light in which [Plaintiff] would be placed.'" *See Colbert v. World Publ'g Co.*, 747 P.2d 286, 290 (Okla. 1987) (quoting *McCormack v. Okla. Publ'g Co.*, 613 P.2d 737, 740 (Okla. 1980)) (internal quotation omitted); *see also Zeran v. Diamond Broad., Inc.*, 203 F.3d 714, 719 (10th Cir. 2000); Restatement (Second) of Torts, § 652E (1977); Okla. Unif. Jury Instr. § 28.15.[2]

## Standard of Decision

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for either party. *Id*. at 255. All facts and reasonable inferences must be viewed in the light most favorable to the nonmovant. *Id*. If a party who would bear the burden of proof at trial lacks sufficient evidence on an essential element of its claim or defense, all other

---

[2] Defendants also raise subsidiary issues regarding the egregiousness of their conduct and compensable damages.

factual issues concerning the claim or defense become immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant bears the initial burden of demonstrating the absence of a dispute of material fact warranting summary judgment. *See id*. at 322-23. If the movant carries this burden, the nonmovant must then "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial. *See Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324; *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 671 (10th Cir. 1998). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see* Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials, but may consider other materials in the record." *See* Fed. R. Civ. P. 56(c)(3). The Court's inquiry is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## Statement of Undisputed Facts[3]

Sports Illustrated produces a sports magazine for national print distribution and online publication through an internet website. Between September 10, 2013, and September 16, 2013, SI magazine published a five-part series of articles under the title, "The Dirty Game," regarding the Oklahoma State University ("OSU") football program.

---

[3] This statement includes material facts that are properly supported and not opposed in the manner required by Rule 56(c)(1) and LCvR56.1(d). All facts properly presented by a party and not specifically controverted by an opponent are deemed admitted, pursuant to Rule 56(e)(2) and LCvR56.1(e).

Defendants George Dohrmann and Thayer Evans co-authored the articles based on investigative interviews. An executive editor of SI magazine, Bruce Schecter, supervised the investigative report and its publication, and interviewed Plaintiff.[4] The first article, "Special Report on Oklahoma State Football: Part 1 – The Money," reported allegations, as described by Plaintiff, "that OSU had a systematic scheme of illegal [financial] boosting activities" and "Plaintiff was a financial booster whose generosity far exceeded that of OSU football fans and was improper." Am. Compl. ¶¶ 16, 18. A six-paragraph passage of the article contains allegedly false statements made by former OSU football players about Plaintiff, as well as statements made by Plaintiff, and is set forth in its entirety, *infra*.

When the SI article was published (and currently), Plaintiff was the North Central Oklahoma Area Director for the Oklahoma Fellowship of Christian Athletes ("OFCA"), which is an affiliate of the national Fellowship of Christian Athletes organization. As OFCA director, Plaintiff sometimes arranged speaking engagements for student athletes that consisted of formal oral presentations in structured settings, such as a church meeting, banquet, assembly, or conference, for which the students were reimbursed for mileage and food. Plaintiff also engaged student athletes to participate in "team building" activities arranged by OFCA, which involved performing a physical challenge that could teach a skill, followed by a student-led discussion of mental, physical, emotional, or spiritual lessons related to the challenge. The students were paid to do team-building events.

---

[4] According to Plaintiff, the interview was brief ("five minutes or less") and was followed by a telephone call and a planned meeting for him to produce records, but the meeting was later cancelled and did not occur. *See* Talley Dep. 33:17-36:21. Plaintiff also responded to a follow-up question by email. *See* Defs.' Ex. 23 [Doc. No. 62-23].

Plaintiff lives on a 4.88-acre property near Stillwater, Oklahoma, that could be referred to, as it was in the SI article, as a "ranch."[5] Plaintiff sometimes employed student athletes to perform work on his property for an hourly wage, and he arranged for them to work for neighbors and acquaintances. The work usually involved physical labor, such as fence building, painting, mowing, hay hauling, and cutting and hauling trees. Plaintiff also allowed a football player, Aso Pogi, to live on his property one summer. The article reported two different versions of the arrangement: Pogi said he stayed without paying rent or doing work; Plaintiff said Pogi was expected to perform work in lieu of paying rent. The article included comments allegedly made by an OSU official responsible for compliance with National Collegiate Athletic Association ("NCAA") rules. It stated in pertinent part as follows:

> According to multiple players, though, the generosity of Norris, who died of lung cancer in 2006, was exceeded by that of other Cowboys supporters. John Talley, an area director of the Fellowship of Christian Athletes, had been close to the football program since at least 2002, when his son, Saul, was a walk-on long snapper. "John Talley was the hot name around campus," Johnson says. "If you needed a job, call John Talley."
>
> Carter, Girtman, Johnson and Thomas Wright each say that Talley either grossly overpaid them for jobs they did or compensated them for jobs they didn't do. They allege that numerous other players benefited from Talley's generosity too. Girtman says Talley paid him $1,500 to $2,000 every two weeks during one summer to work on his horse ranch, far more than the job was worth. Talley could also be counted on to set up speaking gigs for players, paying $100 for a 15- to 20-minute talk. "You might get more

---

[5] Plaintiff seeks to dispute this fact by presenting evidence that he and some of his friends view the term "ranch" as suggesting a larger operation than his 5-acre rural property where he kept horses; Plaintiff refers to it in his pleading as a "farm." *See* Am. Compl. ¶ 5. However, Plaintiff did not object to the use of the term "ranch" when he was interviewed for the SI article, and other persons interviewed for the article referred to his property in this way. Thus, the Court finds efforts to cast this term as a false or misleading characterization are ineffectual.

depending on who you were," says Shaw. Carter says he and a few other players were once paid by Talley to help shoe horses. Asked if the players did the work, Carter says, "Are you kidding? Most of us hadn't even seen a horse before."

Quarterback Aso Pogi (1999 to 2002) says he and another player lived at Talley's ranch one summer rent-free. In retrospect Pogi says, "It's a big deal. I was the starting quarterback." (Talley says that Pogi lived at his ranch and had to work to cover his rent; Pogi denies that he did any work.)

Talley says that he sometimes paid players a fee for speaking engagements and that they frequently did work on his ranch, noting he always paid an hourly wage. He also says he cleared the speaking fees and the hourly employment through the university's compliance office. "I have paid lots of players to work on my ranch," Talley says. "But I would never pay someone not to work."

OSU compliance director Kevin Fite says of the speaking engagements arranged by Talley, "They were not cleared through our office as paid speaking engagements. In fact, two of my staff members indicated to me that they had had conversations with John and told him you cannot pay for speaking engagements. If you want to employ our student-athletes for other things, that's fine, but you cannot pay them for speaking engagements."

While Fite says the school cleared Talley to employ athletes on his ranch, he acknowledges that Talley's paying in cash "is not something I am comfortable with. I think that's a concern. I would prefer to see it done a different way."

George Dohrmann & Thayer Evans, *Special Report on Oklahoma State Football: Part 1 – The Money*, SPORTS ILLUSTRATED, Sept. 10, 2013.

Defendants Dohrmann and Evans made audio recordings of the interviews they conducted, and it is undisputed that the former OSU players and the OSU official named in the article made the statements attributed to them.[6] The article did not report that the

---

[6] Plaintiff challenges the truth of the players' statements and the players' credibility, but he does not dispute the accuracy of the recordings or disagree that the article accurately reported what the players said in their interviews. *See*, *e.g.*, Talley Dep. 90:19-91:10, 92:1-3; 92:16-21.

investigation revealed some support for Plaintiff's version of events. Some former OSU football players interviewed for the article said they received modest pay for actual work, and some denied being paid for speaking engagements (other than expenses).[7] The article reported the statements of only five players regarding alleged payments by Talley.[8]

Mr. Schecter recorded his interview of Plaintiff and promptly summarized it in notes he forwarded to Defendants Dohrmann and Evans. Plaintiff does not dispute the accuracy of the statements attributed to him in the article; he instead focuses on the omission from the article of his distinction between team-building events and speaking engagements and his position that players who did speaking engagements received reimbursement for expenses. Plaintiff has admitted he did not provide these explanations to Mr. Schecter during the interview.[9] Further, Defendants present evidence that records produced during the litigation and interviews conducted during a subsequent NCAA investigation show that

---

[7] In stating this fact, the Court has disregarded Plaintiff's Exhibit 8 [Doc. No. 71-8], which is identified as "Excerpts From Interviews" of 12 individuals whose names appear only on the cover page. Although presented in the form of a transcript, the circumstances of the interviews are not explained; the exhibit does not purport to contain sworn testimony that could be considered as affidavits or declarations. The Court sustains Defendants' objection to Exhibit 8 as not authorized by Rule 56(c)(1) and (4). See Defs.' Reply Br. at 4, n.4. Further, to the extent the named individuals were not disclosed in Plaintiff's final witness list, the statements in Exhibit 8 could not be presented in trial testimony, and are improper under Rule 56(c)(2).

[8] Plaintiff makes a factually unsupported statement that these five individuals were "out of over 350 people" who were athletes in the OSU football program between 1999 to 2011. See Pl.'s Resp. Br. at 14, ¶ 18. An introduction to the five-part series, "Special Report on Oklahoma State Football: The Overview," stated that "64 former players" were interviewed during the investigation. See Defs.' Ex. 10 [Doc. No. 62-10] at 1. It also explained that "most of them did not graduate from the university and many left on ill terms." Id.

[9] According to Plaintiff, he was not allowed sufficient time or opportunity to explain his statements to Mr. Schecter.

7

Plaintiff did actually pay some OSU players for speaking engagements.[10]  The records show that a common speaking fee was $100.

Plaintiff presents no facts or evidence to show that Defendants knew the allegations they reported about Plaintiff were false.  He instead argues (mostly without factual support) that Defendants knew or should have known their sources were not credible, and that Defendants' investigation was flawed and incomplete.   Plaintiff cites one instance in which a former player, Fath' Carter, gave incorrect information about an academic matter. Plaintiff also relies on the biased nature of the article, which omitted any reference to former players who supported his version of events or his surprised reaction when he was informed of the allegations.

Finally, in a supplemental brief, Plaintiff presents deposition testimony of SI management that shows, in the opinion of Plaintiff's expert, that Defendants Dohrmann and Evans did not follow generally accepted journalism standards and practices.   Plaintiff also submits recordings of promotional video programs that were made regarding the five-part SI series on the OSU football program.  In one part, Defendant Evans touts the thoroughness of the investigation and arguably vouches for the credibility of the sources. It is unclear when and where the videos were released; they do not form the basis of Plaintiff's tort claim.

---

[10] Plaintiff does not dispute the facts shown by this evidence in the manner required by Rule 56(c).

## Discussion

### A. Placing Plaintiff in a False Light

Plaintiff claims Defendants published "serious and deliberate false allegations against Plaintiff" that portrayed him "as a dishonest man, in that he was systematically engaged in improperly giving OSU football players illegal and unwarranted money." *See* Am. Compl. ¶¶ 60-61. On the summary judgment record presented, however, Plaintiff cannot show a genuine dispute of material fact as to the accuracy of most statements in the SI article because they were presented as allegations of former OSU players and are consistent with the recorded interviews.[11]

The audio recordings submitted by Defendants establish that they accurately reported what OSU football players named in the article said about being overpaid for work, being paid for sham work, being paid for speaking engagements, and staying on Plaintiff's property rent-free. Defendants also reported Plaintiff's denials of the allegations, his statement that he cleared the payments with OSU's compliance office, and confirmation from the compliance office that Plaintiff was cleared to employ players. Regardless whether the allegations made against Plaintiff were true, a media publication is not "false" where a source's statements are accurately reported. *See Green v. CBS Inc.*, 286 F.3d 281, 284 (5th Cir. 2002) ("In cases involving media defendants, such as this, the

---

[11] *See Thomas v. Durastanti*, 607 F.3d 655, 666 (10th Cir. 2010) (facts clearly shown by video recording of event cannot be disputed); *see also Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (court must view "the facts in the light depicted by the videotape" of events); *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1207 (10th Cir.), *cert. denied*, 138 S. Ct. 211 (2017) (although inferences must be drawn in favor of party opposing summary judgment, court "cannot ignore clear, contrary video evidence in the record depicting the events as they occurred").

defendant need not show the allegations are true, but must only demonstrate that the allegations were made and accurately reported."); *Campbell v. Citizens for an Honest Gov't, Inc.*, 255 F.3d 560, 568-69 (8th Cir. 2001) (accurate report of evidence in murder investigation was not false, regardless whether allegations and implication were actually true); *see also Magnusson v. N.Y. Times Co.*, 98 P.3d 1070, 1075-76 (Okla. 2004) (television broadcast that accurately reported patients' complaints about plastic surgeon were protected by fair comment privilege). Further, a media defendant's omission from an otherwise true publication of information that would have placed the subject in a more favorable or balanced light is not actionable as false. *See Machleder v. Diaz*, 801 F.2d 46, 55 (2d Cir. 1986); *see also Brokers Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1108 (10th Cir. 2017); *Polin v. Jews for Jesus*, No. 88-2031, 1991 WL 184101, *6-7 (10th Cir. Sept. 16, 1991) (unpublished).[12]

Plaintiff argues that, regardless whether Defendants accurately reported their sources' accusations, the law does not require him to show the falsity of a particular statement but only that a false impression was created by the context of the statements.[13] The Court is not persuaded by this argument under the circumstances but, instead, finds

---

[12] This rule is based on the constitutional protection of journalists' editorial freedom provided by the First Amendment. Although it has not been stated in a published decision of the Oklahoma Supreme Court, it is consistent with the court's rationale for adopting the "actual malice" standard for invasion-of-privacy torts. *See Colbert*, 747 P.2d at 290-91.

[13] Plaintiff primarily relies on the statement in *Peterson v. Grisham*, 594 F.3d 723, 730 (10th Cir. 2010), that "a claim for false light invasion of privacy can properly rest on a defendant stating a falsehood by implication – such as through the use of innuendo."

10

guidance in *Rinsley v. Brandt*, 700 F.2d 1304 (10th Cir. 1983).[14] There, the court of appeals rejected a psychiatrist's contention that a book criticizing his treatment methods invaded his privacy and placed him in a false light by portraying him "as an irresponsible throwback to the middle ages." *Id*. at 1310. The court expressly rejected the psychiatrist's argument that the district court erred in focusing on the truth or falsity of particular statements, reasoning as follows:

> The proscription against reading statements out of context does not relieve a plaintiff from identifying particular statements or passages that are false and invade his privacy. Unless he can successfully identify particular false statements that, taken in context, create the impression he is a "throwback to the middle ages," [the plaintiff] cannot complain.

*Id*.

In this case, Plaintiff has not identified a false statement in the article regarding the allegations of former OSU football players that, read in context, creates an impression he actually was a dishonest man, improperly giving athletes unwarranted money, as alleged in his pleading. In "Part 1 – The Money," Defendants reported numerous allegations of improper financial payments to OSU football players by assistant coaches, boosters and others, together with the accused persons' denials of receiving or making the alleged payments. The passage of the article about Plaintiff, although understandably upsetting to him, accurately reported former players' statements about him and included his denials. Thus, in the context in which they were made, Defendants' statements about Plaintiff's

---

[14] Although the Tenth Circuit was applying Kansas law, the court looked to common law principles stated in the Restatement of Torts, from which the Oklahoma Supreme Court has also adopted applicable standards to govern invasion-of-privacy torts.

11

alleged financial support of OSU football players cannot reasonably be found to have placed him in a false light.

As to Plaintiff's reported admission that he paid OSU football players for speaking engagements (and so engaged in a practice prohibited by NCAA rules), the Court finds this statement could not place Plaintiff in a false light because it was substantially true. Truth is an absolute defense to the tort claim asserted. *See Rinsley*, 700 F.2d at 1307. Plaintiff has alleged, and has testified in this case, that Mr. Schecter misunderstood his statements because he was referring to team-building talks (distinguished from speeches) and reimbursement for expenses (not speaking fees). However, Plaintiff's denial that he ever paid OSU players for speaking engagements is refuted by the documentary evidence submitted in support of Defendants' Motion. Receipts show, for example, that Plaintiff paid Zach Robinson (an OSU quarterback) $300 for "speaking in Oklahoma City," apart from any reimbursement for food and travel. *See* Defs.' Ex. 31 [Doc. No. 62-31].

The Court cannot consider an assertion of fact to be disputed where a party's version of the facts "'is blatantly contradicted by the record, so that no reasonable jury could believe it.'" *See Price-Cornelison v. Brooks*, 524 F.3d 1103, 1121 (10th Cir. 2008) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *accord Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). Therefore, although Plaintiff disagrees with the way in which Defendants reported his statement about payments for speaking engagements, the article is not actionable as a publication that placed him in a false light.[15]

---

[15] The documents are OFCA records that show Plaintiff was making payments on its behalf and obtaining reimbursement from the organization. Arguably, a more accurate report would

For these reasons, the Court finds that Plaintiff has failed to demonstrate a genuine dispute of fact regarding the falsity of the statements made about him in the article and, therefore, Defendants are entitled to summary judgment on this basis.

**B.     Acting With Actual Malice**

Plaintiff must establish that Defendants published statements about him with "actual malice" – "knowing or reckless disregard of the false light in which the [plaintiff] was being cast." *See Colbert*, 747 P.2d at 292. The standard adopted by the Oklahoma Supreme Court "is the equivalent of the *Hill* teaching that actual malice must be proven with convincing clarity by showing that the defendant had a high degree of awareness of probable falsity or in fact entertained serious doubts as to the truth of the publication." *Id*. at 291 (discussing *Time, Inc. v. Hill*, 385 U.S. 374 (1967)). The standard is met by proof of "actual knowledge of probable falsity," *Jurkowski v. Crawley*, 637 P.2d 56, 60 (Okla. 1981), or "a high degree of awareness of [a statement's] probable falsity." *Herbert v. Okla. Christian Coal.*, 992 P.2d 322, 328-29 (Okla. 1999) (internal quotation omitted). The test is a "subjective one" measured by the defendant's state of mind rather than a reasonable-publisher standard. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989); *Herbert*, 992 P.2d at 329; *Jurkowski*, 637 P.2d at 61-62. The Oklahoma Supreme Court has held that reckless disregard is not 1) a failure to conduct a thorough or reasonably prudent investigation, 2) negligence, 3) ill will or a desire to injure,

---

have stated that OFCA paid OSU football players for speaking engagements. Because Plaintiff does not make this distinction, however, the Court does not consider it.

4) reliance on the unverified statement of a third party, or 5) a showing that the statement was derogatory or untrue. *Herbert*, 992 P.2d at 328-29.

Plaintiff here presents no facts or evidence that might reasonably satisfy the rigorous standard required to establish "actual malice" or even to demonstrate a genuine dispute of material fact in this regard. He argues, unsupported by any facts asserted in the manner required by Rule 56, that Defendants were pursuing an agenda designed to produce a sensational, unfavorable story about the OSU football program and they created a biased report after "an extended effort to arrive at the story they wanted." *See* Pl.'s Resp. Br. at 29. Notably, Plaintiff does not argue that he was a target of Defendants' alleged agenda, or that they had any independent knowledge of him or his reputation for honesty and integrity, which might have cast doubt on the allegations against him. In his supplemental brief, Plaintiff relies on Defendants' alleged "deliberate and repeated failure to adhere to standard practices of reporting." *See* Pl.'s Suppl. Resp. Br. at 7. None of these allegations or assertions of fact could reasonably be found to show either actual knowledge or a high degree of awareness by Defendants that the allegations about Plaintiff by former OSU football players were probably false.

Therefore, the Court finds that Plaintiff has failed to demonstrate a genuine dispute of fact relevant to the issue of whether Defendants acted with actual malice, and thus Defendants are entitled to summary judgment on this basis.

## Conclusion

For these reasons, the Court finds that Plaintiff has failed to demonstrate a genuine dispute of material fact that precludes summary judgment. Therefore, Defendants are entitled to summary judgment in their favor.

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment [Doc. No. 60] is GRANTED. A separate judgment shall be entered accordingly.

IT IS SO ORDERED this 21st day of September, 2018.

_____
TIMOTHY D. DEGIUSTI
UNITED STATES DISTRICT JUDGE