**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 8, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

JOHN THOMAS TALLEY,

     Plaintiff - Appellant,

v.

TIME, INC., d/b/a Sports Illustrated
Magazine; GEORGE DOHRMANN;
THAYER EVANS,

     Defendants - Appellees.

No. 18-6169

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:14-CV-00853-D)**
_____

Raymond S. Allred (Gary L. Richardson, Charles L. Richardson, Alisa G. Hopkins, and
Lia R. Rottman, with him on the briefs), of Richardson Richardson Boudreaux, PPLC,
Tulsa, Oklahoma, for Plaintiff - Appellant.

Robert D. Nelon (Jon Epstein, with him on the brief), of Hall, Estill, Hardwick, Gable,
Golden & Nelson, P.C., Oklahoma City, Oklahoma, for Defendants - Appellees.
_____

Before **MATHESON**, **MURPHY**, and **EID**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

In 2013, *Sports Illustrated* magazine ("*SI*") published a five-article series on the Oklahoma State University ("OSU") football program. The series explored "illicit payments" and other "extreme measures" OSU used to recruit and retain top players. Aplt. App., Vol. II at A446; Aplt. App., Vol. III at A699. The first article in the series, titled "The Money," described an assistant coach who offered "de facto bonus[es] . . . based on performances on the field." Aplt. App., Vol. II at A448. It also discussed boosters and coaches who made "direct payments to players . . . independent of performance," *id.*, and "funnel[ed] money to players through dubious work arrangements," *id.* at A452.[1] And it briefly profiled John Talley, a booster who "had been close to the football program since at least 2002" and who allegedly "grossly overpaid [OSU players] for jobs they did or compensated them for jobs they didn't do." *Id.*

Mr. Talley sued Time, Inc., which publishes *SI*, and *SI* reporters Thayer Evans and George Dohrmann (collectively, "the Defendants") in state court, claiming that the article placed him in a false light and invaded his privacy. Invoking diversity jurisdiction under 28 U.S.C. § 1332, the Defendants removed the case to the United States District Court for the Western District of Oklahoma. After discovery, the

---

[1] According to the National Collegiate Athletic Association ("NCAA"), a booster—or "representative[] of [an] institution's athletic interests"—is an individual who supports "teams and athletics departments through donations of time and financial resources which help student-athletes succeed on and off the playing field." *See* https://perma.cc/R96W-G7AZ.

Defendants moved for summary judgment.  The district court granted the motion.

Mr. Talley timely appealed.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm because Mr. Talley

has not demonstrated a genuine issue of material fact as to whether the Defendants

acted with actual malice, an element of Oklahoma's false light tort.

## I.  **BACKGROUND**

### A. ***Oklahoma's False Light Tort*[2]**

Oklahoma recognizes the common law tort of false light invasion of privacy.

It has adopted the Restatement (Second) of Torts § 652E, which reads:

> One who gives publicity to a matter concerning another
> that places the other before the public in a false light is
> subject to liability to the other for invasion of his privacy,
> if
>
> (a) the false light in which the other was placed would be
> highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless
> disregard as to the falsity of the publicized matter and the
> false light in which the other would be placed.

*See McCormack v. Okla. Publ'g Co.*, 613 P.2d 737, 740 (Okla. 1980) (recognizing

"the tort of invasion of privacy . . . as set out in the Restatement"); *Colbert v. World*

*Publ'g Co.*, 747 P.2d 286, 290 (Okla. 1987) (noting that the Oklahoma Supreme

---

[2] Because federal court jurisdiction in this case is based on the diversity of citizenship between the parties, 28 U.S.C. § 1332, we apply the substantive law of the forum state—Oklahoma.  *See Haberman v. Hartford Ins. Grp.*, 443 F.3d 1257, 1264 (10th Cir. 2006) ("In diversity cases, the substantive law of the forum state governs the analysis of the underlying claims . . . .").

Court has "specifically adopt[ed] the treatment of [invasion of privacy] in the Restatement of the Law of Torts (Second)").

False light plaintiffs must prove three elements:

> (1) "the defendant gave publicity to a matter concerning the plaintiff that placed the plaintiff before the public in a false light,"
>
> (2) "the false light in which the plaintiff was placed would be highly offensive to a reasonable person," and
>
> (3) "the defendant had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."

*Mitchell v. Griffin Television, LLC*, 60 P.3d 1058, 1061 (Okla. Civ. App. 2002).

Oklahoma courts have specified that the third element—"knowledge of or . . . reckless disregard as to the falsity of the publicized matter"—is identical to the actual malice standard articulated in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). *See Herbert v. Okla. Christian Coal.*, 992 P.2d 322, 328 (Okla. 1999) (quoting *New York Times*, 376 U.S. at 280).[3]  We discuss this standard in greater detail below.

### B.  *Factual Background*

*SI* is a sports magazine published by Time, Inc.  Aplt. App. Vol. I at A85.  In early 2012, Mr. Evans, who was then a reporter at Fox Sports, learned that the OSU football program might have been using financial inducements to attract and retain

---

[3] Because Oklahoma has explicitly adopted the actual malice standard for false light invasion of privacy claims, the following analysis uses the term "actual malice" as shorthand for the "knowledge of or . . . reckless disregard" element of the false light tort.  *Mitchell*, 60 P.3d at 1061.

players. *Id.* at A86; Aplt. App., Vol. II at A388. That fall, after taking a job at *SI*, Mr. Evans shared this information with *SI*'s Executive Editor B.J. Schecter. Aplt. App., Vol. II at A388. Mr. Schecter asked Mr. Dohrmann if he would be interested in working with Mr. Evans on a story about the OSU program. *Id.* When Mr. Dohrmann agreed, *SI* began a 10-month investigation into OSU's recruiting and retention practices. Aplt. App., Vol. I at A87; Aplt. App., Vol. II at A388, A438. Mr. Schecter led the investigation, which involved dozens of interviews with OSU players, coaches, and boosters. Aplt. App., Vol. I at A86-88; Aplt. App., Vol. II at A438, A442.

In September 2013, *SI* published its findings in a five-part article series titled "The Dirty Game." Aplt. App., Vol. II at A445-82. Below, we quote the passage about Mr. Talley, which appeared in the first article of the series. We then describe the steps *SI* took to investigate, research, draft, and edit the Talley passage.

1. **The Article**

Mr. Dohrmann and Mr. Evans co-authored "The Dirty Game" using information they gathered during *SI*'s investigation. Aplt. App., Vol. I at A87-88; Aplt. App., Vol. III at A770. The first article of the series—a roughly 5,000-word piece titled "The Money"—described gratuities and inducements that OSU used to attract and retain top players. Aplt. App., Vol. II at A445-53. It detailed financial benefits—including payments for performance on the field—that coaches offered to players on the team. *Id.* It also described how several "boosters," including Mr.

5

Talley, "funnel[ed] money to players," *id.* at A452, by paying them "for little or no

work," *id.*

Mr. Talley was the North Central Area Director of the Fellowship of Christian

Athletes ("FCA").[4] *Id.* at A452; Aplt. App., Vol. I at A135. The 442-word passage

about him reads, in full, as follows:

> According to multiple players, though, the
> generosity of [booster Kay] Norris, who died of lung
> cancer in 2006, was exceeded by that of other [OSU]
> Cowboys supporters. John Talley, an area director of the
> Fellowship of Christian Athletes, had been close to the
> football program since at least 2002, when his son, Saul,
> was a walk-on long snapper. "John Talley was the hot
> name around campus," [player Rodrick] Johnson says. "If
> you needed a job, call John Talley."
>
> [Players Fath'] Carter, [Brad] Girtman, [Rodrick]
> Johnson and Thomas Wright each say that Talley either
> grossly overpaid them for jobs they did or compensated
> them for jobs they didn't do. They allege that numerous
> other players benefited from Talley's generosity too.
> Girtman says Talley paid him $1,500 to $2,000 every two
> weeks during one summer to work on his horse ranch, far
> more than the job was worth. Talley could also be counted
> on to set up speaking gigs for players, paying $100 for a
> 15- to 20-minute talk. "You might get more depending on
> who you were," says Shaw. Carter says he and a few other
> players were once paid by Talley to help shoe horses.
> Asked if the players did the work, Carter says, "Are you
> kidding? Most of us hadn't even seen a horse before."
>
> Quarterback Aso Pogi (1999 to 2002) says he and
> another player lived at Talley's ranch one summer rent-

---

[4] In his deposition, Mr. Talley explained that the FCA's mission is "[t]o reach coaches, student athletes, and all who they influence, to give the opportunity to receive Jesus Christ as Lord and Savior, and to serve Him in their relationships and in the church." Aplt. App., Vol. I at A136.

free.  In retrospect Pogi says, "It's a big deal.  I was the starting quarterback."  (Talley says that Pogi lived at his ranch and had to work to cover his rent; Pogi denies that he did any work.)

Talley says that he sometimes paid players a fee for speaking engagements and that they frequently did work on his ranch, noting he always paid an hourly wage.  He also says he cleared the speaking fees and the hourly employment through the university's compliance office.  "I have paid lots of players to work on my ranch," Talley says.  "But I would never pay someone not to work."

OSU compliance director Kevin Fite says of the speaking engagements arranged by Talley, "They were not cleared through our office as paid speaking engagements.  In fact, two of my staff members indicated to me that they had had conversations with John and told him you cannot pay for speaking engagements.  If you want to employ our student-athletes for other things, that's fine, but you cannot pay them for speaking engagements."

While Fite says the school cleared Talley to employ athletes on his ranch, he acknowledges that Talley's paying in cash "is not something I am comfortable with.  I think that's a concern.  I would prefer to see it done a different way."

George Dohrmann & Thayer Evans, *Special Report on Oklahoma State Football:  Part 1 – The Money*, *Sports Illustrated*, Sept. 16, 2013, at 39-40; Aplt. App., Vol. II at A452.

2.  **The Reporting Process**

As previously noted, *SI* began investigating the OSU football team in late 2012.  Aplt. App., Vol. I at A86-87.  Between 2000 and 2005, OSU achieved its first winning seasons in more than a decade.  Aplt. App., Vol. II at A445.  The Defendants suspected that new and perhaps impermissible recruiting strategies might have

contributed to this sudden success. *Id.* They focused their research on individuals who were involved with the program between 2000 and 2005. *Id.* at A388.

    a. *Interviews with players and Mr. Talley*

The *SI* reporters interviewed 60 to 70 former and current OSU players, coaches, boosters, and administrators. Aplt. App., Vol. I at A87; Aplt. App., Vol. II at A388-90; Aplt. App., Vol. III at A747. The reporters recorded the interviews they used to write the passage about Mr. Talley. Aplt. App., Vol. II at A389. These recordings were later produced during discovery.[5] In addition, Mr. Schecter

---

[5] In support of their motion for summary judgment, the Defendants provided the district court with audio excerpts from Mr. Dohrmann's interview with former OSU player Fath' Carter, Aplt. App., Vol. II at A483; Mr. Evans's interviews with former players Rodrick Johnson, *id.* at A487, Seymour Shaw, *id.* at A497, Brad Girtman, *id.* at A505, Thomas Wright, *id.* at A517, Aso Pogi, *id.* at A512, Larry Brown, *id.* at A518, and Chijuan Mack, *id.* at A519; Mr. Dohrmann and Mr. Evans's interview with Thomas Wright, *id.* at A509, and Mr. Schecter and Mr. Dohrmann's interview with OSU officials, *id.* at A523. The Defendants also provided audio excerpts from an interview that NCAA investigators conducted with OSU operations director Mack Butler during the NCAA's post-article investigation. Aplt. App., Vol. III at A546. Mr. Talley submitted full-length interview recordings of Mr. Evans's interviews with former players Aso Pogi, Aplt. App., Vol. IV at A894, Calvin Mickens, *id.* at A895, Chijuan Mack, *id.* at A896, Thomas Wright, *id.* at A897, and Xavier Lawson-Kennedy, *id.* at A898.

interviewed Mr. Talley.[6]  *Id*. at A404.  We describe below the information gathered about Mr. Talley during these interviews.[7]

### i.  Mr. Evans's interviews

Mr. Evans conducted most of the interviews.  *Id.* at A388.  After each interview, he reviewed his notes and/or the recording and e-mailed summaries to Mr. Dohrmann and Mr. Schecter.  *Id*. at A389-90, A408, A438.  He also occasionally re-interviewed players to ensure that his information was accurate.  *Id.* at A390.

### 1)  Payments for speeches and work

Between November 2012 and January 2013, Mr. Evans spoke to former OSU players Brad Girtman, Seymour Shaw, Prentiss Elliott, Chijuan Mack, Xavier Lawson-Kennedy, Doug Bond, Thomas Wright, Rodrick Johnson, T.J. Minor, and Larry Brown.  *Id.* at A389.  The players reported the following:

- Brad Girtman revealed that Mr. Talley paid him "fifteen hundred, a thousand" dollars to perform "ranch hand" tasks.  Dist. Ct. Doc. 60, Ex. 17 at 0:14-0:20, 0:42 (Girtman Interview); *see also* Aplt. App., Vol. II at A508.  When Mr. Evans asked if these payments were excessive, Mr. Girtman responded, "I mean, I thought he was overpaying me, cus I wasn't sure what I was doing."  Girtman Interview at 0:06-0:13.

- Seymour Shaw reported that Mr. Talley "always paid [players] to go talk" and that "if you needed some money, you'd go to John Talley."  Dist. Ct.

---

[6] Although Mr. Schecter recorded his interview with Mr. Talley, he stated that the file was "corrupted after a minute and a half."  Aplt. App., Vol. II at A410.  Accordingly, the recording is not available.

[7] In this opinion, we have quoted from the interview recordings, which are part of the record on appeal, without the benefit of transcripts.  The parties did not provide certified transcripts.

Doc. 60, Ex. 15 at 1:09-1:13, 1:16-1:19 (Shaw Interview); *see also* Aplt. App., Vol. II at A500.

- Chijuan Mack volunteered Mr. Talley's name without any prompting from Mr. Evans and described the speaking arrangements and team building activities that Mr. Talley organized for OSU players. Dist. Ct. Doc. 71, Ex. 12 at 45:49-46:37 (Mack Interview). When Mr. Evans asked, "So, like, during the season you would go speak to schools, read to schools, and they'd pay you like a normal job, obviously?," Mr. Mack responded, "No, during the season you couldn't get paid during the season. . . . But during the summer, you'd get to go there, he got a big farm like, he'd do stuff like focus groups . . . That's when you would get paid." *Id*. at 47:45-48:56.[8]

- Mr. Evans asked Larry Brown, "You would go talk to kids and [Mr. Talley] would pay you to go talk to kids, right?" Mr. Brown responded, "Yeah." Dist. Ct. Doc. 60, Ex. 25 at 0:39-0:45 (Brown Interview).

- Thomas Wright denied that Mr. Talley ever overpaid him for work. Dist. Ct. Doc. 71, Ex. 13 at 6:23-36 (Evans Wright Interview). When Mr. Evans mentioned that "some guys got paid" for Mr. Talley's speaking engagements, Mr. Wright responded, "I know some guys did, but I didn't. I didn't get paid for that." *Id*. at 6:27-45. In a different interview, Mr. Wright stated that OSU players worked for boosters but "got kinda overpaid." Dist. Ct. Doc. 60, Ex. 19 at 0:00-0:21 (Evans Dohrmann Wright Interview). When asked about Mr. Talley, Mr. Wright said, "I don't think he was into all that, he seemed pretty good, but I mean he had to have been a booster I would think . . . . He was hooking us up big time with jobs, but I

---

[8] Mr. Mack denied that players were overpaid for work and stated that OSU "made sure they did everything by the law." Mack Interview at 39:40-40:18. But he also reported that OSU did all it could to take advantage of what was permitted under the rules: "[If] the rules say that you can do this, . . . if that's the case, [OSU would follow] the rule all the way to the nitty gritty. . . . So they would have somebody go to check that and he would come back and be like, 'Well look they can do this and this,' so the next time we'd get our monthly check, the check might go up a hundred or 200 . . . it would fluctuate because they tryin' to get us more." *Id*. at 42:36-43:14. As another example, Mr. Mack reported that coaches would not hand players extra cash but instead gave team captains additional money—two or three hundred dollars—on their OSU ID cards, which players could spend anywhere on campus. *See id.* at 43:15-45:12.

don't think, as far as giving us money, I don't think—he'd never hand us money . . . but he would definitely hook us up with jobs." *Id.* at 0:53-1:21.

- Rodrick Johnson reported that Mr. Talley overpaid him for work. When Mr. Evans asked about "jobs that you guys got paid crazy amounts for," Mr. Johnson immediately interrupted and said, "John Talley, John Talley. Oh, he owes me, still to this day." Dist. Ct. Doc. 60, Ex. 13 at 0:00-0:07 (Johnson Interview). Mr. Johnson then added, "He used to pay very well. I would work for about three hours and I would get paid probably about 400 bucks." *Id.* at 0:15-0:22. Mr. Johnson described cutting bushes and doing yard work on Mr. Talley's property and said, "Max[imum,] I would do probably about ten hours and I would get—a lot of money. Like, it'd be enough to actually make it through the summer." *Id.* at 0:51-1:00. Mr. Johnson also noted that, while some employers paid with an "actual check that wasn't anything under the table," "Talley would pay in cash." *Id.* at 2:32-2:39. Additionally, Mr. Johnson said that Mr. Talley paid him for speaking engagements and that "one time I went to speak at a school and he paid me 100 bucks, and it was, like, for 20 minutes" and that "[t]here were guys that did that almost every day." *Id.* at 2:42-3:02. He also stated "John Talley was the hot name around campus tryin' to get jobs. If you need a job, call John Talley." *Id.* at 3:20-3:25; *see also* Aplt. App., Vol. II at A494.

- Xavier Lawson-Kennedy stated that he never worked for Mr. Talley but that he "actually wanted to" because "[Mr. Talley] had the funnest . . . he had the best jobs to do, like go talk to kids." Dist. Ct. Doc. 71, Ex. 14 at 13:20-32 (Lawson-Kennedy Interview).

By March 2013 Mr. Evans had spoken with 19 players. According to his notes, "five [of these] admitted to taking cash, including three who said they were paid for their play, and two others admitted receiving extra per diem money." Aplt. App., Vol. II at A389. In addition, "[f]ive players said they were either paid for no-show jobs or were significantly overpaid for work." *Id.* Multiple players—including Mr. Girtman, Mr. Shaw, Mr. Brown, Mr. Wright, and Mr. Johnson—volunteered Mr.

Talley's name or provided detail about his involvement with the OSU program.  *Id.* at A389, A438.

### 2)  Mr. Pogi living at the ranch

Shortly before publishing the article, Mr. Evans interviewed former OSU quarterback Aso Pogi.[9]  *Id.* at A390.  Mr. Pogi said he frequently participated in Mr. Talley's speaking engagements but insisted he was never paid to speak.  Dist. Ct. Doc. 71, Ex. 10 at 4:43-4:52 (Pogi Interview).  He also described living on Mr. Talley's ranch one summer.  The relevant exchange proceeded as follows:

> Mr. Evans:  So, how many times do you estimate John [Talley] gave you money?  John admitted that he gave money.  Just that way you know that I'm not lying to you.  John admitted it, said that he cleared it with the school, the school said they never cleared it, and that John was never supposed to give you guys money.
>
> Mr. Pogi:  Um, I don't know, man, it was, you know, just speaking engagements—
>
> Mr. Evans:  You spoke a lot, though?
>
> Mr. Pogi:  Yeah I did, and, and, you know, we don't get anything.
>
> Mr. Evans:  I know, I know, listen, and that's another argument for another day. . . . But you spoke dozens of times, is what people said.

---

[9] The record does not indicate when this interview occurred, but in the interview recording, Mr. Evans told Mr. Pogi, "We talked to John [Talley] yesterday."  Dist. Ct. Doc. 71, Ex. 10 at 5:56-6:02 (Pogi Interview).  Mr. Schecter interviewed Mr. Talley on September 3, 2013, Aplt. App., Vol. II at at A404, which suggests that Mr. Evans's conversation with Mr. Pogi occurred on September 4, 2013.

Mr. Pogi:  Yeah.

Mr. Evans:  And he gave you money dozens of times.

Mr. Pogi:  I was on the road a lot to speak.  And it was just for my gas, you know, just cus I had to drive my personal vehicle there, you know what I mean?  But, um—

Mr. Evans:  It's not an indictment that you've done anything wrong, Aso, okay?  I'm not—

Mr. Pogi:  And listen, I'm, I'm not really, I'm not taking it that way.  I'm, I'm kinda like, this is kinda throwing me off—

Mr. Evans:  It is, and it should. . . . There's no good way to do it, Aso.  You have to understand, I mean, from my perspective, there's no good way to do it.  Cus if I call you ahead of time, you know, I want to get in front of you because, again, like, your name is in the story for money.

Mr. Pogi:  Yeah, that, and that, that kinda, that kinda hurts me a little bit.

Mr. Evans:  I mean, Aso, I mean, I'm sorry, you know?  I mean, there's just nothing I can do about it.  You know what I'm saying?  I mean, like, that's why I came to get your response.  And we'll put your response in there.

Mr. Pogi:  Well let me, let me just say this, then.  Let me say that, um, I'd like to just, um, I'm not going to sit here and plead the Fifth or anything like that, but I, I'd like to, like, you know, do my own research on it, because I'm being honest with you in telling you that, you know, we received gas money, and—

Mr. Evans:  That's fine.  I mean, I'll tell you what you're gonna find.  Because I know it, I mean, I know it from the NCAA perspective, right?  I mean, like I said, we went to them and told them, right?  John said that he had had that approved, okay?  Compliance said that they never approved it, Aso.  So he was—and it's against the rules for

13

you to be paid during the season, any of that stuff, for speaking engagements, et cetera.

Mr. Pogi:  And guys put me out there?

Mr. Evans:  They threw, oh, absolutely.

Mr. Pogi:  That I was the main one, huh?

Mr. Evans:  No. You're not the main one.  I mean, there's a, it's a long list, my man.  Okay?

Mr. Pogi:  I mean, I, I just, I did a—

Mr. Evans:  You worked at his ranch, too.

Mr. Pogi:  I did a lot.

Mr. Evans:  You worked at his ranch.

Mr. Pogi:  I—I lived there.

Mr. Evans:  You lived there, but you never, you never worked—

Mr. Pogi:  I ne—I didn't, I didn't do anything like—

Mr. Evans:  You knew guys came out there and worked.  I mean he says estimates a thousand athletes have worked at his ranch.

Mr. Pogi:  Yeah.

Mr. Evans:  A thousand.  I mean some people said that they got paid for not doing anything at his ranch.  You know they just came out and they just basically got money—

Mr. Pogi:  [Laughs]

. . . .

14

Mr. Evans:  I mean, you lived with John [Talley], right?  I mean, what was the arrangement?

Mr. Pogi:  I had no arrangement.  That's the thing that's throwing me off.  I'm like, "Arrangement?"  I-I-I didn't make, you know, any money.

Mr. Evans:  But you shouldn't have been, I mean, like, you lived with him.

Mr. Pogi:  Yeah I lived with him.

Mr. Evans:  I mean, like, I mean did anybody ever—

Mr. Pogi:  Me and George Horton, we, we lived with John, and, you know, we—

Mr. Evans:  He didn't charge you rent, obviously.

Mr. Pogi:  No, he didn't charge us rent.  No, no, we lived there for a summer, you know and that was about it.

Mr. Evans:  And you saw the guys come out and work.  What'd you do for money in the summers?  You went and did the speaking engagements?

Mr. Pogi:  I did speaking engagements.  I did a lot of speaking.  But I wasn't getting paid like that.  I mean, I got gas money.

*Id*. at 9:41-12:29; 17:24-18:13.

ii.  <u>Mr. Dohrmann's interviews</u>

Mr. Dohrmann also spoke with players and OSU officials.  He met in Denver with former OSU player Fath' Carter.  During that interview, Mr. Dohrmann said, "The other one I heard was . . . that there were like some funky jobs, like you go and mow the lawn, or you don't mow the lawn."  Dist. Ct. Doc. 60, Ex. 11 at 0:00-0:11 (Carter Interview).  Before Mr. Dohrmann could finish the question, Mr. Carter

15

interrupted and said, "You're talking about John Talley." *Id.* at 0:12-0:14. Mr.

Carter then added, "Yeah, however that was constructed, I have no idea. But I was a

big part of that . . . a lot of athletes." *Id.* at 0:18-0:28. Mr. Dohrmann asked if there

was "one funny job" that Mr. Carter remembered. *Id.* at 0:30-0:34. The conversation

proceeded as follows:

> Mr. Carter:  There wasn't a job!
>
> Mr. Dohrmann:  Yeah but I mean, what was the job on paper . . . ?
>
> Mr. Carter:  Uh, well there was no paper for one.
>
> Mr. Dohrmann:  Well, you know what I mean. In theory, you were supposed to—
>
> Mr. Carter:  It would be, um, like one funny one was out to his ranch, I'm putting the horseshoes on the horses.
>
> Mr. Dohrmann:  But you don't actually, no way you guys, you guys never got on a horse in your life.
>
> Mr. Carter:  [Laughing] Yeah. . . . Yeah that was a quick buck, cash.
>
> . . . .
>
> Mr. Dohrmann:  How did guys view it? Did they view it like, "We earned this, like, this is only fair? Doin' what we're doin'."
>
> Mr. Carter:  It was fair, but we viewed it as, "I'm gonna get paid." You know, "Let me do some work for John Talley so I can go out and buy some shoes."

*Id.* at 0:34-2:24; *see also* Aplt. App., Vol. II A323-24, A484.

16

Mr. Dohrmann later called Mr. Carter to verify his statements about shoeing horses. At his deposition, Mr. Dohrmann testified that during this phone call, Mr. Carter again said "something about shoeing horses and [that he had] never seen a horse before" and that "[h]e didn't do the work but he was paid." Aplt. App., Vol. II at A325-27.

### iii. Mr. Schecter's interview with Mr. Talley

On September 3, 2013, Mr. Schecter had a brief conversation with Mr. Talley outside the OSU basketball arena.[10] *Id.* at A404. Mr. Schecter informed Mr. Talley of the allegations against him. Aplt. App., Vol. III at A718. He also asked about speaking arrangements and whether Mr. Talley had overpaid players for work. *Id.*; Aplt. App., Vol. II at A443. Mr. Talley confirmed he had hired and paid OSU players to work on his property but insisted he had cleared the employment arrangements with OSU's compliance office. Aplt. App., Vol. I at A168; Aplt. App., Vol. II at A417. Mr. Schecter recorded the conversation on his cell phone, Aplt. App., Vol. II at A409, and summarized the interview in an e-mail that he sent to Mr. Evans and Mr. Dohrmann. *See id*. at A443, A520-23.[11] He also gave Mr. Talley his

---

[10] Mr. Talley stated Mr. Schecter was "in a hurry to get out of [the car]," Aplt. App., Vol. I at A204, and that the whole interview lasted about five minutes, Aplt. App., Vol. III at A680. Mr. Schecter said the interview lasted about 15 to 20 minutes. Aplt. App., Vol. II at A443.

[11] Mr. Talley claimed in his deposition that Mr. Schecter arranged a second meeting with him and OSU's general counsel on Friday of the same week but cancelled the meeting because "he had enough information." Aplt. App., Vol. III at

contact information and invited him to reach out with any questions. *Id*. at A424, A443.

On September 6, 2013, Mr. Schecter sent Mr. Talley an e-mail that read, "Aso Pogi told us that he . . . lived on your range [sic] rent-free for one summer.  Is that true?" *Id.* at A515; *see also id.* at A425.  Mr. Talley responded, "No, there was an expectation of work for [Mr. Pogi's] room and board that was done." *Id.* at A514.  Mr. Schecter then asked if Mr. Talley "report[ed] this arrangement to Oklahoma State," and Mr. Talley responded, "[Y]es, to athletic compliance." *Id.*; *see also id.* at A425.

b. *Meetings with OSU officials*

On September 3, 2013, Mr. Schecter and Mr. Dohrmann met with OSU Athletic Director Mike Holder, Associate Athletic Director for Compliance Kevin Fite, and General Counsel Gary Clark to "solicit their comment."  Aplt. App., Vol. II at A439; *see also id.* at A443; Aplt. App., Vol. III at A766.  This meeting was not recorded, but both Mr. Schecter and Mr. Dohrmann testified at their depositions that they spent several hours "present[ing] the substance of the information [they] had learned in [their] investigation about the role money, drugs, women, and academics played in the OSU football program."  Aplt. App., Vol. II at A439; *see also id.* at

A719.  Mr. Schecter "categorically den[ied]" this claim during his deposition.  Aplt. App., Vol. II at A431-32.

18

A443. In his affidavit, Mr. Schecter said "this meeting was 'off the record'"—"the officials did not give us any comments for publication." *Id.* at A443.

On September 4, 2013, Mr. Schecter and Mr. Dohrmann held a second meeting with the same OSU officials. This time, they recorded the meeting. *See* Dist. Ct. Doc. 60, Ex. 28 (OSU Officials Interview); *see also* Aplt. App., Vol. II at A439, A443. They asked the OSU officials to verify Mr. Talley's claim that he had received clearance to pay students for speaking engagements.[12] Mr. Fite said the speaking engagements "were not cleared through our office as paid speaking engagements." OSU Officials Interview at 1:02-1:07. He added, "In fact, two of my staff members indicated to me this morning that they had had conversations with [Mr. Talley] and had told him, 'You cannot pay for speaking engagements. If you wanna employ our student athletes for other things, that is fine, but you cannot pay them for speaking engagements.'" *Id.* at 1:07-1:25.

c. *Writing and editing*

In spring 2013, the *SI* reporters determined they had gathered enough information to begin drafting the article. Aplt. App., Vol. II at A438. Mr. Dohrmann assumed primary writing duties. As he wrote, he reviewed Mr. Evans's notes and

_____

[12] In the interview recording, Mr. Schecter said, "One thing [Mr. Talley] did say was that, whether it was routinely or regularly, but certainly plenty of times, that he did, indeed, set up speaking engagements for football players, and that on numerous occasions that they were paid for those speaking engagements. He said it coulda been 50 dollars, it coulda been 100 dollars, or whatever, but that was cleared through your office." OSU Officials Interview at 0:09-0:42.

listened to audio recordings of the interviews. *Id.* at A439. He also identified

"places where [the reporters] needed more information, or the name of a source, or

specific details about what a former player had said about his experience." *Id.* Mr.

Dohrmann sent drafts of the article to editors and to Mr. Evans, who reviewed the

work as it was written. *Id.* at A390. He also spoke frequently with Mr. Evans and

Mr. Schecter to ensure "[they] had sufficient substantiation for what *SI* was

reporting." *Id.*

Mr. Dohrmann's drafts underwent *SI*'s standard editing and review process,

which Mr. Schecter described as follows:

> Well . . . it starts off with a draft of the story being filed.
> That story is then edited, fact-checked, vetted by our legal
> team, copy-edited, read one more time by the writers and
> editors involved in the . . . story, and then finally, it goes to
> press.

*Id.* at A400. As part of this revision process, other *SI* editors "[made] notes in

the drafts to suggest word changes for clarity or flow, or ask[ed] questions

about what the sources said about the facts." *Id.* at A439. In addition, *SI* fact

checkers reviewed each draft and "would confirm specific facts, such as the

spelling of a name, the dates when players attended OSU, the name of the high

school from which a player was recruited, and so on." *Id.*

Mr. Schecter also performed an editing role, which involved "making

sure . . . the story [was] clear and concise . . . and . . . mak[ing] sure that things

track"—that is, "if you say something, it's supported by something else, and

20

that the piece is fair and balanced." *Id.* at A399. He repeatedly listened to the recording of his conversation with Mr. Talley to "confirm the accuracy of the quotes that [the Defendants] were using . . . and make sure that [they] gave [Mr. Talley] every attempt to deny the allegations that [they] made against him." *Id.* at A415-16.

     d. *Pre-publication legal and editorial review and publication*

*SI* completed edits and revisions just days after the September 4 meeting with the OSU officials. *Id.* at A444. Time's in-house counsel reviewed the final draft, *id.*, and Chris Stone, *SI*'s Managing Editor, approved it, *id.* at A439, A444. *SI* published the first article online on September 10, 2013, and released the remaining four articles online between September 11 and September 17, 2013. Aplt. App., Vol. III at A700-A701. It also printed the first article in its September 16, 2013 print issue and included the final article in its September 23, 2013 print issue.[13] *Id.*

3. **Individual Defendants' Depositions and Affidavits**

After Mr. Talley filed his lawsuit, the reporters and editor responsible for "The Dirty Game" all stated they believed the series was truthful and substantiated. In his deposition, Mr. Evans said, "I believe that we published accurate information about the allegations that players had made about Mr. Talley." Aplt. App., Vol. II at A379.

---

    [13] *SI* published the second, third, and fourth articles only online.

And in his affidavit, Mr. Evans said he "was completely satisfied that what we were reporting was truthful based on the information we had gotten from the dozens of on-the-record sources." *Id.* at A390. As to the passages on Mr. Talley, he stated:

> [T]hose sources—players who had been at OSU at different times and who were interviewed independently— corroborated one another. By talking with them personally I was able to assess their credibility, and I did not sense any bias toward [Mr.] Talley or other reasons that would make me doubt the accuracy of what they were telling me about him or what we reported in the article. I remain completely satisfied in this regard today.

*Id.* at A390-91.

In his deposition, Mr. Dohrmann said "[i]t's very difficult to get players to [admit to NCAA violations]" and that "[f]ive players is a significant number [of sources] with a story like this." *Id.* at A337. He had "done a lot of stories like this" and had "done stories with far less than five [sources]." *Id.* Because "a number of sources . . . told [the reporters] a similar or same story about Oklahoma State and John Talley," he felt "absolutely certain about what we were writing." *Id.* at A342. Mr. Dohrmann also stated in his affidavit that he "had heavily researched the article and reviewed all the sources," "the facts [the interviewees] provided were consistent with and corroborative of one another," he "did not observe any signs of bias . . . among the sources or other facts that would cause [him] to question their credibility," and he "did not doubt the accuracy of any statement in the article." *Id.* at 439-40.

At his deposition, Mr. Schecter said he believed the article "was very well done" and "was all true." *Id.* at A431. And in his affidavit, he stated, "I believed

when the article . . . was published it was accurate and truthful.  I was satisfied that all the statements in the article about [Mr.] Talley were adequately substantiated by multiple sources and were truthful. . . . My opinion has not changed despite [Mr.] Talley's lawsuit."  *Id.* at A444.

## C. *Procedural Background*

In July 2014, Mr. Talley filed his lawsuit in state court.  Aplt. App., Vol. I at A11.  He named Time, Inc., Mr. Dohrmann, and Mr. Evans as defendants, but he did not sue Mr. Schecter.  Invoking diversity jurisdiction under 28 U.S.C. § 1332, the Defendants removed the case to the United States District Court for the Western District of Oklahoma.

After the parties completed the discovery process, the Defendants moved for summary judgment.  They argued, among other things, that Mr. Talley was "unable to prove with competent evidence that at least one of the statements about which he complains satisfies all of the elements of a false light claim."  *Id.* at A107.  Mr. Talley opposed the motion, claiming "disputed issues of material fact exist[ed]" with respect to all three elements of his false light claim.  Aplt. App., Vol. III at A694.

The district court granted summary judgment for the Defendants, finding Mr. Talley could not demonstrate a genuine dispute of material fact regarding the first (falsity) or third (actual malice) elements of his false light claim.  *Talley v. Time, Inc. d/b/a Sports Illustrated Magazine*, No. CIV-14-853-D, 2018 WL 4558993, at *5-6 (W.D. Okla. Sept. 21, 2018).

23

With respect to the third element—whether *SI* acted with actual malice—the court found "[Mr. Talley] present[ed] no facts or evidence to show that Defendants knew the allegations they reported about [him] were false." Aplt. App., Vol. V at A1197. Although Mr. Talley argued Defendants "were pursuing an agenda" and crafted "a sensational, unfavorable" narrative to get "the story they wanted," the court found his allegations were "unsupported by any facts" and could not "reasonably be found to show either actual knowledge or a high degree of awareness by Defendants that the allegations about [Mr. Talley] . . . were probably false." *Id.* at A1203. The court thus concluded Mr. Talley "present[ed] no facts or evidence that might reasonably satisfy the rigorous standard required to establish 'actual malice' or even to demonstrate a genuine dispute of material fact in this regard." *Id.*

## II. **DISCUSSION**

The following discussion concludes that Mr. Talley has not shown that a reasonable jury could find that the Defendants acted with actual malice. Summary judgment was therefore appropriate.

### A. *Legal Background*

This section describes (1) the standard of review for summary judgment, (2) the elements of Oklahoma's false light tort, and (3) the actual malice standard.

### 1. **Standard of Review**

As this court has recognized in defamation cases, "[we] review summary judgment decisions de novo, applying the same legal standard as the district court."

24

*Cory v. Allstate Ins.*, 583 F.3d 1240, 1243 (10th Cir. 2009) (quotations omitted).

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Cory*, 583 F.3d at 1243 (quotations omitted).

"[A] party seeking summary judgment always bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). "A movant that does not bear the burden of persuasion at trial may satisfy this burden by pointing out to the court a lack of evidence on an essential element of the nonmovant's claim." *Teets v. Great-West Life & Annuity Ins. Co.*, 919 F.3d. 1232, 1243 (10th Cir. 2019) (quotations omitted).

"If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant." *Id.* (quotations omitted). "These facts must establish, at a minimum, an inference of the presence of each element essential to the case." *Savant Homes*, 809 F.3d at 1137-38 (quotations omitted). The movant is entitled to summary judgment if the nonmoving party cannot provide facts "to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 1138 (quotations omitted).

25

Both the Supreme Court and Oklahoma state courts have held that at trial, the plaintiff must prove actual malice with "convincing clarity." *New York Times*, 376 U.S. at 286-87; *Colbert*, 747 P.2d at 291. The Supreme Court has said courts "must bear in mind" this heightened burden of proof when ruling on a defendant's motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986) (holding that courts must consider "the actual quantum and quality of proof necessary to support liability under *New York Times*" when considering summary judgment on the actual malice issue). "[I]f the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence," then "there is no genuine issue" and summary judgment is appropriate. *Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1048 n.13 (10th Cir. 2013) (quotations omitted).[14]

2. **Oklahoma's False Light Tort**

As discussed above, Oklahoma recognizes the common law tort of false light invasion of privacy. The plaintiff must show:

> (1) "the defendant gave publicity to a matter concerning the plaintiff that placed the plaintiff before the public in a false light,"

---

[14] *Spacecon* involved a defamation claim brought under Colorado law, which required the plaintiff to demonstrate actual malice by clear and convincing evidence. 713 F.3d at 1041.

26

(2) "the false light in which the plaintiff was placed would be highly offensive to a reasonable person,"

(3) "the defendant had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."

*Mitchell*, 60 P.3d at 1061 (citing *McCormack*, 613 P.2d at 740); *see also* Restatement (Second) of Torts § 652E (Am. Law Inst. 1977).

"[E]ssential to . . . a false light privacy claim . . . is a determination that that the matter published concerning the plaintiff is not true." *Rinsley v. Brandt*, 700 F.2d 1304, 1307 (10th Cir. 1983) (quotations omitted).[15]  Thus, to establish the first element of a false light claim, a plaintiff must show the defendant made a statement that "portrayed [plaintiff] in [a] false manner or that statements were untrue or misleading." *McCormack*, 613 P.2d at 741 (holding that plaintiff failed to state a cause of action for false light invasion of privacy because plaintiff did not allege that the published statements were false or misleading).  True statements are not actionable under Oklahoma's false light tort.

To satisfy the second element, the plaintiff must show "a reasonable [person] would be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity."  Restatement (Second) of Torts §652E, cmt. c.  Put differently, "[i]t is only when there is such a major misrepresentation of [the

---

[15] *Rinsley* involved a false light invasion of privacy claim brought under Kansas law.  Like Oklahoma, Kansas has adopted the false light invasion of privacy action set forth in Restatement (Second) of Torts § 652E.  *See Rinsley*, 700 F.2d at 1307.

plaintiff's] character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position, that there is a cause of action for invasion of privacy." *Id.*

The third element—knowledge of or reckless disregard as to falsity—is identical to the actual malice standard from *New York Times Co. v. Sullivan*. *See Colbert*, 747 P.2d at 290-92 (noting that Oklahoma has "adopted" the actual malice test from *Time, Inc. v. Hill*, 385 U.S. 374 (1967), which applied the *New York Times* actual malice standard in a false light invasion of privacy case); *Grogan v. Kokh, LLC*, 256 P.3d 1021, 1030 (Okla. Civ. App. 2011) (noting that "the Oklahoma Supreme Court has adopted the [*New York Times*] actual malice test for false light invasion of privacy claims").[16] Thus, to establish the third element of a false light claim, a plaintiff must show the defendant made or published its statements "with 'actual malice'—that is, with knowledge that [they were] false or with reckless disregard to whether [they were] false or not." *New York Times*, 376 U.S. at 280. We next discuss the Supreme Court cases that have articulated and developed this standard.

---

[16] Although the Supreme Court has applied the actual malice standard in at least one false light invasion of privacy case, *see Time, Inc.*, 385 U.S. 374, the standard originated in *New York Times*, which was a defamation case. As a result, Oklahoma courts analyzing the third element of a false light tort claim routinely look to and rely on both defamation and false light case law. *See, e.g.*, *Grogan*, 256 P.3d at 1031 ("analogizing to defamation law" where there is no clear false light case law on point).

3. **Actual Malice**

   a. *New York Times and its progeny*

   In *New York Times v. Sullivan*, the Supreme Court said that a publication "was made with 'actual malice'" when the defendant published "with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279-80; *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 343 (1974). The plaintiff's burden of proving actual malice cannot be met by a preponderance of the evidence. Actual malice must be shown with "convincing clarity," *New York Times*, 376 U.S. at 285-86—that is, by "clear and convincing proof," *Gertz*, 418 U.S. at 342.

   Actual malice is not a negligence or gross negligence standard. *See Garrison v. Louisiana*, 379 U.S. 64, 79 (1964); *Hardin v. Santa Fe Reporter, Inc.*, 745 F.2d 1323, 1326 (10th Cir. 1984) (holding that reporter's negligence in failing to investigate a source's background and in writing the article could not establish actual malice). It requires more than showing a publication was false and defamatory, *New York Times*, 376 U.S. at 288, and more than "a departure from reasonably prudent conduct," *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989).

   Actual malice is a subjective standard that requires proof of a "mental element." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 276 (1971); *see Harte-Hanks*, 491 U.S. at 688 (stating actual malice is a subjective standard). The actual malice inquiry thus "rests entirely on an evaluation of [the publisher's] state of mind when he wrote his initial

report, or when he checked the article against that report." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 494 (1984).

In *St. Amant v. Thompson*, 390 U.S. 727 (1968), the Supreme Court explained:

> [R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*Id.* at 731.

A plaintiff does not create a jury question of actual malice by showing that a publisher failed to investigate before publishing. *Gertz*, 418 U.S. at 332; *St. Amant*, 390 U.S. at 731; *Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 84-85 (1967) (per curiam)[17]; *New York Times*, 376 U.S. at 287[18]; *Revell v. Hoffman*, 309 F.3d 1228, 1233 (10th Cir. 2002). Nor does a plaintiff do so by showing that a publisher misinterpreted the source material or omitted details favorable to the plaintiff. *Time, Inc. v. Pape*, 401 U.S. at 282, 290-92 (1971). A publisher's decision to omit details

---

[17] In *Beckley*, for example, the Supreme Court, having reviewed testimony from the newspaper's general manager that no investigation of the allegedly defamatory statements had been made, held, "[I]t cannot be said on this record that any failure of petitioner to make a prior investigation constituted proof sufficient to present a jury question whether the statements were published with reckless disregard or whether they were false or not." 389 U.S. at 84-85.

[18] In *New York Times*, the Court found the evidence insufficient to establish actual malice even though checking news stories in the Time's own files would have revealed the falsity of a part of the challenged publication. 376 U.S. at 287-88.

favorable to the plaintiff does not, itself, show actual malice. *See id.* (finding no actual malice where a publisher did not specify that "it was reporting no more than allegations"). Even "a deliberate alteration of the words uttered by a plaintiff does not equate with [actual malice] . . . unless the alteration results in a material change in the meaning conveyed by the statement." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991).

Actual malice may be found when a publisher had a "subjective awareness of probable falsity." *Gertz*, 418 U.S. at 334 n.6. For example, evidence that a publisher knew its sources were unreliable but made no attempt to verify their information, *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 157-59 (1967), or that a publisher knew it was publishing contested allegations but deliberately ignored sources or information that might reveal what actually happened, *Harte-Hanks*, 491 U.S. at 690, may establish actual malice. Other examples include "a story [that] is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call"; circumstances where the published statements "are so inherently improbable that only a reckless man would have put them in circulation"; or situations "where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant*, 390 U.S. at 732.

Most of the Supreme Court's actual malice case law, including *New York Times*, comes from defamation suits. But the Supreme Court has, like Oklahoma, applied the actual malice standard to a false light claim. In *Time, Inc. v. Hill*, 385

U.S. 374 (1967), the Court held that "the constitutional protections for speech and press preclude[d] the application of [a] New York [false light invasion of privacy] statute . . . in the absence of proof that the defendant published the report with knowledge of its falsity or in reckless disregard of the truth." *Id.* at 387-88.

    b.  Oklahoma actual malice cases

    Because Oklahoma courts have expressly adopted the *New York Times* actual malice standard, Oklahoma's defamation and false light case law is consistent with the actual malice principles described above.[19]  Like the Supreme Court, Oklahoma

---

[19] In *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758-61 (1985), the Supreme Court held that the First Amendment requires proof of actual malice only when the statements at issue involve matters of public concern.  In recognizing the false light invasion of privacy tort and equating the third element of that tort to the *New York Times* actual malice standard, Oklahoma courts have not drawn a distinction between false light claims for statements involving matters of public concern as opposed to private concern.  We need not address whether Oklahoma courts would draw any such distinction, because Mr. Talley has not argued that the statements at issue here involve matters of private concern or that the actual malice standard should not apply in this case.

Moreover, the form, content, and context of the *SI* publication establish that the statements at issue here involve a matter of public concern.  *See id.* at 761 (explaining that when determining whether allegedly libelous statements involve a matter of public concern, courts should consider the form, content, and context of the speech).  The statements were printed in a widely-circulated publication.  *Compare Spacecon*, 713 F.3d at 1039 (holding that "a documentary meant to be shown to the public" qualified as speech on a matter of public concern), *with Dun & Bradstreet*, 472 U.S. at 762 (holding that a credit report "made available only to five subscribers" was not speech on a matter of public concern).

More telling, they involved allegations against the football program at one of Oklahoma's major publicly-funded universities.  *See City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004) ("[P]ublic concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public . . . ."); *Spacecon*, 713 F.3d at 1039 (holding that a documentary film exposing mistreatment of Mexican construction workers involved speech on a matter of public concern); *Dun &*

courts have recognized that actual malice exists when "the defendant had a high degree of awareness of probable falsity or in fact entertained serious doubts as to the truth of the publication." *Colbert,* 747 P.2d at 291.  They also have noted that "negligence is not enough to rise to the level of 'actual malice'" and that "malice may not be inferred simply from showing that the publication was untrue." *Herbert*, 992 P.2d at 328.  As in *New York Times*, *St. Amant*, and other Supreme Court cases, Oklahoma courts have stated that "failure to investigate does not establish the actual malice standard." *Jurkowski v. Crawley*, 637 P.2d 56, 61 (Okla. 1981).  They also have followed the Supreme Court in treating the actual malice standard as a subjective inquiry and have stated that actual malice exists only when there is "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Washington v. World Publ'g. Co.*, 506 P.2d 913, 918 (Okla. 1972) (quotations omitted).[20]

---

*Bradstreet*, 472 U.S. at 762 (holding that credit report was not speech on a matter of public concern because it was "solely in the individual interest of the speaker and its specific business audience").  Thus, even if Oklahoma courts would distinguish between speech on matters of public and private concern, the actual malice standard applies in this case.

[20] In *New York Times*, 376 U.S. 254, and *Curtis Publishing Co. v. Butts*, 388 U.S. 130, the Supreme Court held that the actual malice requirement applies when the allegedly defamatory speech is about a public figure or public official.  In *Gertz*, the Court held that the actual malice standard applies to public figures but does not apply in cases brought by private-figure plaintiffs.  418 U.S. at 345-48.
  In 1967, the Supreme Court said in *Hill* that the *New York Times* actual malice standard also applies to false light cases.  *See supra* note 16.  It is not clear whether the 1974 *Gertz* holding—which restricts the actual malice standard to cases brought by

B. *Analysis*

Although the parties have briefed both the first and third false light elements, Mr. Talley's failure to establish either element will defeat his claim. We can resolve this appeal by addressing only the third element—actual malice.

1. **Evidence on Preparation of the Article Lacks Proof of Actual Malice**

The record shows the Defendants conducted a long and thorough investigation before publishing their article. For ten months, the reporters sought out and spoke to dozens of OSU players, coaches, and administrators. They recorded their interviews electronically and in writing. They consulted their notes and each other while drafting the article, and they occasionally re-interviewed individuals to ensure that

---

public officials and public figures—similarly limits the standard's application in false light cases. As one leading commentator has noted, "[a] significant number of cases have held that *Hill* should be regarded as modified by *Gertz*, and that actual malice is not required . . . in false light cases with private figure plaintiffs." 2 Rodney A. Smolla, *Law of Defamation* § 10:16 (2d ed. Nov. 2018 update). But "there is also . . . substantial authority, including the *Restatement Second, Torts*, for the proposition that all false light claims must meet the actual malice standard." *Id. Gertz* thus leaves open the question of whether actual malice is required in *all* false light cases, or only in cases involving statements about public officials or public figures. *See* Restatement (Second) of Torts §652E, cmt. d.

We need not address this question for two reasons. First, Mr. Talley has not argued that he is a private figure. Second, Oklahoma courts have applied the actual malice standard in false light cases involving both public- and private-figure plaintiffs. *See Colbert*, 747 P.2d at 288, 291 (Okla. 1987) (applying the actual malice standard in a false light case involving a plaintiff who was "unquestionably a private figure"); *Grogan*, 256 P.3d at 1029 (holding that the actual malice standard is "required for false light invasion of privacy cases involving public figures").

34

their information was correct.  They also fact-checked and edited their article several times and had their legal team review the piece before publication.

Unlike the publishers in *Harte-Hanks*, the Defendants did not deliberately ignore sources that might have disputed their account.  *See* 491 U.S. at 690.  Rather, they interviewed multiple sources around the country who substantially corroborated each other.  They also verified the information they published by re-interviewing their sources and fact-checking the final piece.  Mr. Talley has provided no evidence that the Defendants "fabricated" their story, based their claims about him on "an unverified anonymous telephone call," or published allegations that were "so inherently improbable that only a reckless man would have put them into circulation."  *St. Amant*, 390 U.S. at 732.  He thus "proffers no evidence indicating that [the Defendants] entertained doubts regarding the truth of the statements in [the publication]."  *Revell*, 309 F.3d at 1233.

In addition, the record shows that the reporters had ample evidence to support the statements in the article about Mr. Talley.  Mr. Pogi and Mr. Talley told the reporters that Mr. Pogi lived on Mr. Talley's ranch without paying rent; four players (Mr. Shaw, Mr. Mack, Mr. Brown, and Mr. Johnson) said Mr. Talley paid them or others they knew for speaking engagements; and three (Mr. Girtman, Mr. Carter, and Mr. Johnson) said Mr. Talley overpaid them for work.  At least two of these sources (Mr. Mack and Mr. Carter) brought up Mr. Talley's name without prompting.  And, as we show below, Mr. Pogi made statements in his interview that the Defendants

35

could reasonably have interpreted to mean he did not work at Mr. Talley's ranch. Further, the players were interviewed independently of one another in different parts of the country and provided consistent accounts.

In sum, the evidence shows the Defendants' article was based on an extended research process and was not the product of deliberate "falsification," *Pape*, 401 U.S. at 289, or the "use of calculated falsehood," *Garrison*, 379 U.S. at 75. There is no indication they published with "a high degree of awareness of probable falsity or . . . entertained [any] serious doubts as to the truth of the publication." *Colbert*, 747 P.2d at 291. Ample evidence supported their reporting about Mr. Talley, who cannot show with "convincing clarity" that the Defendants acted with actual malice. *Id*.

## 2. **Mr. Talley's Arguments**

Mr. Talley argues the Defendants exhibited actual malice by (a) deliberately misstating facts about Mr. Pogi's rent arrangement, (b) falsely reporting that Mr. Talley paid players for speaking engagements, (c) relying on biased and non-credible sources, (d) writing with a slanted agenda, and (e) publishing erroneous and incorrect statements. These arguments do not withstand scrutiny.

### a. *Mr. Pogi's rent*

Mr. Talley argues the Defendants published with actual malice by "inaccurately reporting" that Mr. Pogi lived on Mr. Talley's property rent-free. Aplt. Br. at 15. The Defendants reported in the article that "[Mr.] Pogi denies that he did any work." Aplt. App., Vol. II at A452. According to Mr. Talley, however, "the

interview recording [between Mr. Evans and Mr. Pogi] clearly states Aso Pogi worked extremely hard in exchange for rent." Aplt. Reply Br. at 5; *see also* Aplt. Br. at 6, 16. As a result, Mr. Talley characterizes this allegation in the article as "blatantly false" and "misconstrued," Aplt. Br. at 16-17, and he suggests the Defendants' failure to "accurately report what the interviewees stated" is evidence of actual malice, *id.* at 20.

This argument is unavailing. The article states:

> Quarterback Aso Pogi (1999 to 2002) says he and another player lived at Talley's ranch one summer rent-free. In retrospect Pogi says, "It's a big deal. I was the starting quarterback." (Talley says that Pogi lived at his ranch and had to work to cover his rent; Pogi denies that he did any work.).

Aplt. App., Vol. II at A452. The interview recording does not show this passage "obviously misquote[s] [or] inaccurately report[s] what [Mr.] Pogi stated." Aplt. Reply Br. at 5. Further, it does not suggest the Defendants published with "a high degree of awareness of . . . probable falsity." *Garrison*, 379 U.S. at 74.

In the interview recording, Mr. Pogi said he lived on Mr. Talley's property rent-free. Pogi Interview at 17:32-18:13. He also stated, as the Defendants reported, "It's a big deal. I mean, I was the starting quarterback." *Id.* at 23:20-25. Nowhere in the interview does Mr. Pogi state that he worked "extremely hard in exchange for rent," as Mr. Talley insists. Aplt. Reply Br. at 5.

After reviewing the entire recording of Mr. Evans's interview with Mr. Pogi, we found only one statement—"I did a lot," Pogi Interview at 12:02-12:04—that could possibly indicate that Mr. Pogi worked on the ranch at all.  But that statement is ambiguous.  Mr. Pogi did not specifically state what it was he "did a lot."  Further, he made the statement after telling Mr. Evans that he was "on the road a lot to speak" and had participated in "a lot" of speaking engagements.  *Id.* at 10:00-11:51.  It is therefore possible the statement referenced his speaking engagements rather than ranch work.  Further, when Mr. Evans prompted, "You lived [on the ranch], but you never, you never worked—," Mr. Pogi responded, "I ne—I didn't, I didn't do anything like—."  *Id.* at 12:08-12:11.  And a few questions later, Mr. Pogi insisted he "had no arrangement" with Mr. Talley.  *Id.* at 17:29-17:30.

The interview recording thus includes no definitive statement that Mr. Pogi worked on the ranch.  Although his statement that he "did a lot" might be understood to mean he worked, it could reasonably be interpreted as a reference to speaking engagements.  At most, the Defendants misinterpreted the statement, but a defendant's misinterpretation of source material that "bristle[s] with ambiguities" does not constitute actual malice.  *Pape*, 401 U.S. at 290 (holding that when faced with ambiguous source material, a defendant's "deliberate choice of [one]

interpretation, though arguably reflecting a misconception, [is] not enough to create a jury issue of 'malice' under *New York Times*").[21]

Accordingly, even if the Defendants misinterpreted Mr. Pogi's statement that he "did a lot," their misunderstanding would not establish actual malice. The evidence does not support Mr. Talley's contention that the Defendants "blatantly misquoted what Aso Pogi said," Aplt. Reply Br. at 5, or show they published statements about Mr. Pogi with reckless disregard for the truth.[22]

---

[21] *See also Orr v. Argus-Press Co.*, 586 F.2d 1108, 1116 (6th Cir. 1978) (finding no actual malice when defendants published a rational interpretation of ambiguous source material); *Simmons Ford, Inc. v. Consumers Union of U.S., Inc.*, 516 F. Supp. 742, 751-52 (S.D.N.Y. 1981) (finding no actual malice when defendants published a reasonable but mistaken interpretation of a regulation that "hardly qualify[ed] as a model of clarity"); *Farrakhan v. N.Y.P. Holdings, Inc.*, 168 Misc. 2d 536, 542 (N.Y. Sup. Ct. 1995) (concluding that "even if defendants misinterpreted [an interviewee's] statement, such misinterpretation does not arise to a level of constitutional malice"); *Suozzi v. Parente*, 616 N.Y.S.2d 355, 359 (N.Y. App. Div. 1994) (noting that actual malice cannot "be founded on the misinterpretation of a source or the resolution of an ambiguity adversely to the plaintiff").

[22] Mr. Talley's insistence that the "Defendants blatantly misquoted what Aso Pogi said," Aplt. Reply Br. at 5, may be based on an interview that Chuck Smrt, OSU's outside compliance consultant, conducted with Mr. Pogi during the NCAA's investigation of the OSU football program *after* the *SI* article series was published. In this interview, Mr. Pogi claimed he "worked pretty hard on [Mr. Talley's] farm" and that there was "a lost [sic] land to keep up as far as cutting grass, as far as cleaning the pool and just doing quite a bit of things. Feeding the animals, it was every single day." Aplt. App., Vol. IV at A853. These statements support Mr. Talley's contention that Mr. Pogi did, in fact, work in exchange for lodging. But because this interview occurred *after* the *SI* article was published, it does not prove the Defendants deliberately misquoted Mr. Pogi—or otherwise acted with actual malice—at the time of the original publication. *See Bose*, 466 U.S. at 494 (noting that "the actual-malice determination rests entirely on an evaluation of [the author's] state of mind *when he wrote his initial report*" (emphasis added)).

b. *Payment for speaking engagements*

Mr. Talley also argues the Defendants acted with actual malice when they reported he paid players to speak at events "in violation of NCAA rules and OSU policy." Aplt. Br. at 16. According to Mr. Talley, "Defendants were made aware . . . that 'speaking' meant reimbursement for gas and food" but nonetheless "deliberately chose to disregard its true meaning in order to portray [Mr. Talley] as paying in violation of rules." *Id.* at 18. Mr. Talley also argues that "Defendants never had reason to believe [Mr. Talley] was breaking the rules or illegally paying athletes."[23] *Id.*

These arguments, too, are unpersuasive. Although some players insisted they were reimbursed only for expenses, many (including Mr. Johnson, Mr. Brown, Mr. Wright, and Mr. Shaw) admitted that they or others they knew had received speaking

---

[23] To support his argument, Mr. Talley adds that "Defendants knew [the] NCAA investigated the subject and never determined any violation of the rules by [Mr. Talley]." Aplt. Br. at 18. This argument is unpersuasive. The NCAA investigated the OSU football program *after* the Defendants published "The Dirty Game." *See, e.g.*, Aplt. App., Vol. III at A607 (transcript of NCAA investigatory interview with OSU officials, dated October 17, 2013). As noted above, the actual malice issue focuses on what the author knew (or did not know) at the time of publication, *Bose*, 466 U.S. at 494, and "[e]vidence concerning events after an article has been printed and distributed, has little, if any, bearing on that issue," *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 174 (Tex. 2003). If, as Mr. Talley claims, the NCAA found that his payments did not violate any rules, those findings were not available to the Defendants when they published the article and could not have influenced their state of mind at the time of publication. The NCAA investigation is thus irrelevant.

fees. Mr. Johnson, for example, said Mr. Talley once paid him 100 dollars to speak for 20 minutes. Johnson Interview at 2:42-3:02. Even if Mr. Talley paid speaking fees to certain players and not others, the Defendants still had grounds to believe and report that at least some players received money beyond simple reimbursement. That some players denied receiving speaking fees or claimed they were only reimbursed for expenses does not prove the Defendants "in fact entertained serious doubts" about the players who reported otherwise. *St. Amant*, 390 U.S. at 731; *Colbert*, 747 P.2d at 291.

In addition, Mr. Schecter's notes from his interview with Mr. Talley reflect that Mr. Talley admitted to paying speaking fees.[24] Shortly after meeting with Mr. Talley, Mr. Schecter sent Mr. Dohrmann an e-mail listing "John Talley['s] Responses

---

[24] Although Mr. Schecter recorded the interview with Mr. Talley, the audio file was corrupted. *See supra* note 6. Accordingly, Mr. Schecter's e-mail to Mr. Dohrmann is the only recorded source of information about the interview. In his affidavit, Mr. Schecter stated that he drafted this e-mail shortly after speaking with Mr. Talley: "When I got back to my hotel, I listened to the recording, then made notes, including writing down some direct quotes, as I re-listened to the audio. I emailed my notes to [Mr.] Dohrmann and [Mr.] Evans." Aplt. App., Vol. II at A443. He also testified at his deposition that he listened to the interview recording "[i]mmediately after I got back to my hotel room . . . I would say within an hour after I finished my conversation with Mr. Talley." *Id.* at A411.

During his deposition, Mr. Talley claimed Mr. Schecter "was in a hurry" and "didn't really give [him] an opportunity to" explain himself fully during the interview. Aplt. App., Vol I at A204. But Mr. Talley did not challenge any of the information or quotations contained in the e-mail. In fact, Mr. Talley reviewed the entire e-mail and confirmed he made all the statements that Mr. Schecter attributed to him. *Id.* at A202-05.

to allegations we have against him."  Aplt. App., Vol. II at A520.  On the topic of

"[p]aying players for speaking engagements," Mr. Schecter wrote the following:

> [Mr. Talley said:]  "It depends on . . . there's a
> NCAA rule that if they're paying us . . . and most of the
> time it's for team building activities.  It's not just
> speaking.  But we have done some school assemblies.  Last
> year we did four all sports banquets.  And if the school is
> used to paying someone than [sic] it's legal to get paid.
> But there's a fine line."

> Talley says he ran everything (the jobs and the
> speaking gigs) through the associate compliance director
> who is assigned to the football team.

> "If [players] were allowed to be paid (for speaking
> engagements) they were paid.  We've spoken in
> churches.["]  (They got paid for speaking in churches
> "only if the churches paid someone before.")  Talley says a
> typical speaking fee would be $25-$50.  "I can always pay
> for if they're driving their car we can pay for gas and stuff
> like that."

> Players said it was $100 or more per speaking
> engagement.  "It depends on where we were going," Talley
> said.  "I'm not saying they couldn't because it was a long
> time ago, but usually it was not that much."

*Id.* at A521.  Although it is possible Mr. Schecter and Mr. Dohrmann misunderstood

or misinterpreted Mr. Talley's comments, these interview notes suggest the

Defendants had a reasonable basis to believe Mr. Talley paid speaking fees to some

players.[25]  Further, as discussed above, a defendant's misinterpretation of source

---

[25] During his deposition, Mr. Talley acknowledged that his statements to Mr. Schecter were ambiguous.  When asked, "Do you find anything in [Mr.] Schecter's email that would suggest you made [the] distinction [between speaking and team building] to him?," Mr. Talley responded, "Yes and no.  Yes, I was trying to.  No, he

material does not necessarily establish actual malice.  *Pape*, 401 U.S. at 290.  Thus, even if the Defendants misunderstood Mr. Talley's claim that "[players] were paid" to mean speaking fees rather than reimbursements, that misunderstanding would not prove they published with actual malice.

In sum, although some players claimed they did not receive money to speak, multiple players reported that Mr. Talley arranged paid speaking engagements. Further, notes from Mr. Schecter's interview with Mr. Talley suggest that Mr. Talley admitted to paying speaking fees.  In publishing these allegations, the Defendants did not show reckless disregard for the truth.  Rather, they reported information that multiple sources confirmed and corroborated.  The record does not suggest the Defendants "in fact entertained serious doubts as to the truth of [their] publication," *St. Amant*, 390 U.S. at 731; *Colbert*, 747 P.2d at 291, and Mr. Talley identifies no evidence to demonstrate with "convincing clarity" that the Defendants reported about his paying players for speaking engagements with actual malice, *New York Times*, 376 U.S. at 286-87.

    c.  *Credibility of article sources*

Mr. Talley contends the Defendants demonstrated actual malice by "[seeking] out non-credible, untrustworthy, and troubled sources," Aplt. Br. at 21, and by

---

was in a hurry to get out of my van.  So he didn't really give me an opportunity to. . . . I was trying to clarify that I reimburse people for going to speak. . . . But he didn't stay around long enough to hear it."  Aplt. App., Vol. I at A204.

interviewing and quoting OSU players of "suspect veracity," Aplt. Reply Br. at 8.

He notes that some of the players featured in the article had "troubled histor[ies] . . .

including drug usage, scholastic problems with OSU, and criminal issues." Aplt. Br.

at 14. He claims the Defendants' "conscious decision to feature those interviewees in

the article . . . is evidence of Defendants' malicious intent." Aplt. Reply Br. at 8.

We disagree.

Although the record shows the Defendants interviewed and quoted some OSU

players who used drugs or had criminal records,[26] "[s]ources need not be paragons of

virtue for journalists safely to rely on them." 1 Robert D. Sack, *Sack on Defamation:*

*Libel, Slander, and Related Problems* §5:5.2(C) at 5-109 (5th ed. 2017). Courts have

consistently held that reliance on tainted or troubled sources does not alone establish

actual malice. *See, e.g.*, *Pemberton v. Birmingham News Co.*, 482 So. 2d 257, 266

---

[26] For their segment on Mr. Talley, the Defendants relied primarily on statements and interviews from Mr. Girtman, Mr. Shaw, Mr. Mack, Mr. Brown, Mr. Wright, Mr. Johnson, Mr. Lawson-Kennedy, Mr. Pogi, and Mr. Carter. The interviews revealed that several of these sources had substance abuse problems: Mr. Girtman used drugs and failed drug tests, Aplt. App., Vol. III at A801; Mr. Johnson admitted to smoking marijuana, Aplt. App., Vol. II at A490, A492-93; Mr. Shaw failed drug tests and used a masking agent to conceal his marijuana use, *id*. at A501; and Mr. Mack and Mr. Brown either used drugs or knew of other players who did, *id.*at A389, A464. The record also suggests at least two of these players may have had criminal records. Mr. Talley's original complaint stated that Mr. Shaw had been convicted of larceny and burglary, though it is not clear that the Defendants knew this when they published their article. Aplt. App., Vol. IV at A909. In addition, the call between Mr. Evans and Mr. Wright was timed and took place over a controlled line which indicates Mr. Wright was either in jail or prison. Evans Wright Interview at 10:15-10:39.

(Ala. 1985) (finding that defendant's reliance on statements from an ex-convict was insufficient to show actual malice); *Secord v. Cockburn*, 747 F. Supp. 779, 794 (D.D.C. 1990) (holding that "[t]he use of convicted felons cannot alone constitute a fact of actual malice").  The fact that some of the Defendants' sources were not "paragons of virtue" is thus insufficient to show actual malice.  Sack, §5:5.2(C) at 5-109.

Courts also have noted that "newspaper investigation of reports of corruption must often obtain first-hand corroboration from those present in the barrooms or gambling houses, rather than from citizens who spend their time only at home, in church, or at work in less colorful occupations."  *Kidder v. Anderson*, 354 So.2d 1306 (La. 1978).  Here, the five-article series reported on drug use, financial misconduct, and academic dishonesty in the OSU football program.  To prepare this report, the Defendants necessarily had to rely on sources who may have participated in these activities.  Rather than demonstrating that the Defendants published with actual malice, this shows they sought information from the sources who were in the best position to describe these possible features of the OSU program.  *See Pemberton*, 482 So. 2d at 266 (noting that "the fact that [a source] was an ex[-]convict did not diminish his credibility . . . but rather made it more probable that he would have inside information" that could aid the defendants' investigation).

Although some of the interviewees who provided information about Mr. Talley used drugs or had criminal records, the reporters stated they "did not observe any . . .

45

facts that would cause [them] to question [the players'] credibility."  Aplt. App., Vol.

II at A440 (Dohrmann Affidavit); *see id.* at A390-91 (Evans Affidavit).  The *SI*

reporters interviewed multiple individuals—including some who did not have

troubled pasts—and stated that, though "players spoke to [them] independently, at

different times and different places, . . . the facts those players provided were

consistent with and corroborative of one another."  *Id*. at A439-40 (Dohrmann

Affidavit); *see id.* at A390-91 (Evans Affidavit).  "That these . . . sources

corroborated each other's allegations sufficiently establishes [that the Defendants]

dispelled [any of their] doubts" about the players' veracity.  *Spacecon*, 713 F.3d at

1046.  Mr. Talley thus has not shown there were "obvious reasons to doubt the

veracity" of the player sources.  *St. Amant*, 390 U.S. at 732.

In sum, Mr. Talley has failed to show the Defendants' use of "troubled" or

tainted sources demonstrated actual malice.  Aplt. Br. at 14.  The record shows the

passages relating to Mr. Talley were based on "sources which were not believed to be

false."  *Rosanova v. Playboy Enters., Inc.*, 580 F.2d 859, 862 (5th Cir. 1978).  Unlike

the defendants in *Butts*, the Defendants did not rely on a single, questionable source

without fact-checking, interviewing additional witnesses, or seeking independent

support.  388 U.S. at 157-58.  And this case has no resemblance to *Harte-Hanks*,

where the defendants knew the facts in their publication "had been denied . . . by five

other witnesses before the story was published."  491 U.S. at 691.  Although the

article here quoted some of the players who had "troubled histor[ies]," Aplt. Br. at

46

14, Mr. Talley has not shown the Defendants had "obvious reasons to doubt the veracity of the [players] or the accuracy of [their] reports," *Harte-Hanks*, 491 U.S. at 688 (quotations omitted). Nor has he shown that the players' drug use or other misconduct gave the Defendants a "high degree of awareness of probable falsity or . . . serious doubts as to the truth of [their] publication." *Colbert*, 747 P.2d at 291.

d. *Slant, bias, motive, and omissions*

Mr. Talley argues the Defendants exhibited actual malice by presenting a slanted, biased, and "sensationalized" narrative. Aplt. Br. at 4. He contends the Defendants crafted their story to fit their "own investments and motives," *id.* at 13, and demonstrated actual malice by "specifically target[ing]," Aplt. Reply Br. at 8, his reputation "as a respected pastor and mentor," *id.* at 2. He also claims the Defendants "omit[ted] material statements." Aplt. Br. at 21. These arguments also fail.

i. <u>Slant and bias</u>

Mr. Talley suggests the "Defendants sought a certain narrative from interviewees," *id.* at 14, and "achieved the story they desired to portray," *id.*, by "seek[ing] out biased individuals who would provide a sensational story," *id.* at 4. But he provides no concrete supporting evidence to show this was the case. Even if he could, it would not show the Defendants published with actual malice.

Although the Defendants may have developed a theme for their article—their e-mail correspondence, for example, includes a discussion of whether a particular

47

player's "experience fits our narrative," Aplt. App., Vol. II at A498—that alone does not show they doubted the truth of their publication.  Indeed, the Defendants, not Mr. Talley, are entitled to choose their theme.  It is the "function of editors" to decide "[t]he choice of material to go into a newspaper."  *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 255 (1974).  Further, "[t]he fact that a commentary is one sided . . . has no tendency to prove that the publisher believed it to be false." *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1307 (D.C. Cir. 1996).  Thus, to the extent Mr. Talley could provide evidence to show the Defendants wrote an article consistent with a theme or narrative, he has not established they published with actual malice.

> ii. <u>Motive</u>

Mr. Talley contends the Defendants had "independent knowledge of [Mr. Talley's] standing in the community," Aplt. Br. at 20, and "specifically targeted" his "reputation for honesty," Aplt. Reply Br. at 8.  He further claims the Defendants had "obvious reasons to doubt the veracity of the . . . information discovered in their investigations . . . due to . . . [their] own investments and motives."  Aplt. Br. at 13.

Despite his contention that the Defendants published with improper motives, Mr. Talley does not specify what those "investments and motives" might have been. *Id*.  He also does not identify any evidence that the Defendants "specifically targeted" him.  Aplt. Reply Br. at 8.  The Defendants spent only a fraction (442 words) of their 20,000-word, five-part series discussing Mr. Talley, which suggests their purpose

48

was not to tarnish his reputation.  But even if the Defendants "targeted" Mr. Talley, that would not prove they had doubts about the article's veracity or published with actual malice.  *See, e.g.*, *Spacecon*, 713 F.3d 1028 (noting that "a publisher's adversarial stance . . . is not necessarily indicative of actual malice") (quotations omitted).

Although "[t]he motivation behind a publication is a factor to consider," *id.* at 1042, "courts must be careful not to place too much reliance on [motive]," *Harte-Hanks*, 491 U.S. at 668; *see also Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 281-82 (stating that "ill will toward the plaintiff, or bad motives are not elements of the *New York Times* standard").  As this court said in *Spacecon*, "[E]vidence of [defendant's] . . . bias is not enough to show he acted with actual malice."  713 F.3d at 1043; *see also Harte-Hanks*, 491 U.S. at 665; *Tavoulareas v. Piro*, 817 F.2d 762, 795 (D.C. Cir. 1987) (stating a publisher's "adversarial stance" may be "fully consistent with professional, investigative reporting" and is not necessarily "indicative of actual malice") (quotations omitted).  Mr. Talley has not identified evidence of the Defendants' bias against him, much less shown that bias established actual malice.

### iii.  Omissions

Mr. Talley briefly argues the Defendants showed actual malice by "omitting material statements."  Aplt. Br. at 14.  Mr. Talley does not identify in his briefing what, specifically, the Defendants omitted from their article.  Even if he had done so,

he has not shown how omissions would prove the Defendants published with actual malice.[27]  Courts have noted that "the author of an article will have to choose which facts to include and which to omit," because "[i]t is impossible to print all of the facts on which an opinion or belief is based, especially when an article comprises a critical analysis."  *Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341, 1352 (S.D.N.Y. 1977). Accordingly, "recovery for a false light tort may not be predicated on . . . [a defendant's failure] to include additional facts which might have cast the plaintiff in a more favorable or balanced light."  *Machleder v. Diaz*, 801 F.2d 46, 55 (2d Cir. 1986); *see also Reliance Ins. Co.,* 442 F. Supp. at 1352 (citations omitted) (finding that "selective omission of relevant data" does not provide "circumstantial evidence of defendants' actual malice"); *Pape*, 401 U.S. at 282, 290-92 (holding that a publisher did not demonstrate actual malice by omitting the word "alleged" from its description of a legal complaint against police officers).  Mr. Talley has not shown the Defendants' decision to publish certain facts while omitting others demonstrates actual malice.

---

[27] In his initial complaint, Mr. Talley argued the Defendants "omitt[ed] material facts about the true, and proper nature of Aso Pogi's temporary living arrangements with [Mr. Talley's] family."  Aplt. App., Vol. I at A19.  And in response to their motion for summary judgment, he argued the Defendants "omitted players who reported never having seen or heard of players being paid for speaking engagements."  Aplt. App., Vol. III at A680.  On appeal, however, Mr. Talley makes only general allegations about omissions and does not identify any specific facts or statements that the Defendants excluded from their article.

e. *Error(s)*

Mr. Talley contends the Defendants demonstrated actual malice by publishing inaccurate information. *See* Aplt. Br. at 4, 20. But other than his misplaced claim about misquoting Mr. Pogi, which we addressed above, Mr. Talley does not identify any specific errors or inaccuracies in his appellate briefs.[28] This argument is therefore inadequately briefed. Moreover, the record shows the Defendants fact-checked and verified the information they used in their article. Without evidence of any knowing or reckless falsehood, Mr. Talley cannot show the Defendants' alleged, unspecified mistakes were anything more than negligent, which is "insufficient to show the recklessness that is required for a finding of actual malice." *New York Times*, 376 U.S. at 288.

Relatedly, the Supreme Court has held that "failure to investigate . . . is not sufficient to establish reckless disregard." *Harte-Hanks*, 491 U.S. at 688. A plaintiff cannot demonstrate malice "merely by showing that the publication was erroneous." *Herbert*, 992 P.2d at 329 (citing *Gertz*, 418 U.S. at 340-41; *St. Amant*, 390 U.S. at

---

[28] In his initial complaint, Mr. Talley alleged the Defendants failed to check facts about Mr. Carter's academic record. *See* Aplt. App., Vol. IV at A910. Mr. Talley does not raise this argument on appeal, so we do not address it here. *See City of Colo. Springs v. Solis*, 589 F.3d 1121, 1135 n.5 ("[A]rguments not raised in the opening brief are waived."); *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief.")

732; *New York Times*, 376 U.S. at 281).  Thus, Mr. Talley's general allegation about inaccuracy does not show the Defendants "had a high degree of awareness of probable falsity or in fact entertained serious doubts as to the truth of the publication."  *Colbert*, 747 P.2d at 291.

\*    \*    \*    \*

The Oklahoma Supreme Court described "[t]he 'actual malice' standard [as] a formidable one."  *Herbert*, 992 P.2d at 328.  Mr. Talley has failed to show he could satisfy it here.  The Defendants were thorough in their investigation, editing, and review.  Mr. Talley has not shown they published with "knowledge that [their statements were] false or with reckless disregard of whether [they were] false or not."  *New York Times*, 376 U.S. at 280.  He cannot show "with convincing clarity" that the Defendants acted with actual malice.  *Colbert*, 747 P.2d at 291.

## III. **CONCLUSION**

We affirm the district court's entry of summary judgment in favor of the Defendants.

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
## OFFICE OF THE CLERK

Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

Elisabeth A. Shumaker
Clerk of Court

May 08, 2019

Chris Wolpert
Chief Deputy Clerk

To all Counsel of Record

RE:     **18-6169, Talley v. Time, Inc., et al**
         Dist/Ag docket: 5:14-CV-00853-D

Dear Counsel/Appellant:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(a)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. If requesting rehearing en banc, the requesting party must file 6 paper copies with the clerk, in addition to satisfying all Electronic Case Filing requirements. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R. 35 and 40 for further information governing petitions for rehearing.

Sincerely,

*Elisabeth A. Shumaker*

Elisabeth A. Shumaker
Clerk of the Court

EAS/klp